

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-18-2007

# In Re: Daimler

Precedential or Non-Precedential: Precedential

Docket No. 05-2363

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"In Re: Daimler " (2007). *2007 Decisions.* Paper 335.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/335

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 05-2363

\* TRACINDA CORPORATION,

Appellant

v.

DAIMLERCHRYSLER AG, a Federal Republic of
Germany Corporation; DAIMLER-BENZ AG, a Federal
Republic of Germany Corporation; JURGEN SCHREMPP, a
citizen of the Federal Republic of Germany;
MANFRED GENTZ, a citizen of the Federal Republic of
Germany; HILMAR KOPPER, a citizen of the Federal
Republic of Germany

\* (Caption Amended as per the Clerk's 8/24/07 Order)

No. 05-2482

IN RE: DAIMLERCHRYSLER AG SECURITIES

LITIGATION

DaimlerChrysler AG; Daimler-Benz AG,
Jurgen Schrempp, and Manfred Gentz,

Appellants

---

Appeal from the United States District Court
for the District of Delaware
(D.C. Nos. 00-cv-00993, 00-cv-00984, 00-cv-00995,
00-cv-00997, 00-cv-00999, 00-cv-01000, 00-cv-01001,
00-cv-01003, 00-cv-01008, 00-cv-01009, 00-cv-01010,
00-cv-01011, 00-cv-01022, 00-cv-01023, 00-cv-01025,
00-cv-01031, 00-cv-01033, 00-cv-01039, 00-cv-01042,
00-cv-01072, 01-cv-00004, 01-cv-00122, 01-cv-00128,
01-cv-00138, 01-cv-00638)
District Judge:  Honorable Joseph J. Farnan, Jr.

---

Argued on September 26, 2006


Before: RENDELL, CHAGARES and ROTH, <u>Circuit Judges</u>


(Opinion Filed: September 18, 2007)



Natalie J. Haskins, Esquire

Alan J. Stone, Esquire
Jay N. Moffitt, Esquire
Morris, Nichols, Arsht & Tunnell
1201 North Market Street
P. O. Box 1347
Wilmington, DE 19899

Terry N. Christensen, Esquire **(ARGUED)**
Mark G. Krum, Esquire
Eric P. Early, Esquire
Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, LLP
10250 Constellation Boulevard, 19th Floor
Los Angeles, CA 90067

Julie E. Kamps, Esquire
William G. McGuinness, Esquire
Fried, Frank, Harris, Shriver & Jacobson, LLP
One New York Plaza
New York, NY 10004

       Counsel for Appellant/Cross-Appellee
       Tracinda Corporation


Thomas J. Allingham, III, Esquire
Robert S. Saunders, Esquire
Skadden, Arps, Slate, Meagher & Flom, LLP
One Rodney Square
P. O. Box 636
Wilmington, DE 19899

Jonathan J. Lerner, Esquire **(ARGUED)**
Lea H. Kuck, Esquire
Joseph N. Sacca, Esquire
Skadden, Arps, Slate, Meagher & Flom, LLP
Four Times Square
New York, NY 10036

        Counsel for Appellees/Cross-Appellants
        DaimlerChrysler AG,
        Daimler-Benz AG, Jurgen Schrempp and
        Manfred Gentz

Jeffrey A. Barist, Esquire **(ARGUED)**
Douglas W. Henkin, Esquire
Josh Porter, Esquire
Milbank, Tweed, Hadley & McCloy, LLP
One Chase Manhattan Plaza
New York, NY 10005

        Counsel for Defendant/Appellee
        Hilmar Kopper

————

O P I N I O N

————

**ROTH**, *Circuit Judge*:

4

This appeal arises from the 1998 merger of Daimler-Benz AG, a German corporation and owner of the Mercedes-Benz brand, and Chrysler Corporation, one of the "Big Three" American automakers. Prior to closing, the merger had been billed as a "merger of equals," with management of the new company, DaimlerChrysler AG, to be shared equally between former Daimler-Benz and Chrysler executives. Shortly after the merger, however, several former Chrysler executives left the company, leaving a greater share of control to the former Daimler-Benz executives. In 2000, the CEO of DaimlerChrysler, Jurgen Schrempp, made public statements suggesting that these management changes were exactly what he and other Daimler-Benz executives had wanted prior to the merger. In response, various Chrysler shareholders, including Kirk Kerkorian's investment company, Tracinda Corporation, brought suit against DaimlerChrysler, Daimler-Benz, Schrempp, Manfred Gentz, and Hilmar Kopper (Defendants), alleging fraud, misrepresentation, and other violations of the federal securities laws in connection with the merger. The Chrysler shareholders alleged that, had they known the merger was a takeover, rather than a "merger of equals," they would have demanded a change-in-control premium upon consummation of the merger.

The cases were consolidated before the United States District Court for the District of Delaware. Defendants reached a settlement with most of the plaintiffs. Tracinda's case, however, culminated in a bench trial. In April 2005, the District Court issued a lengthy written opinion, finding in favor of Defendants on all counts. Tracinda appealed that finding, as well as the District Court's pre-trial rulings striking Tracinda's

5

demand for a jury trial and dismissing defendant Hilmar Kopper for lack of personal jurisdiction. Defendants have cross-appealed, contending that the District Court erred in its post-trial decision, levying a half-million-dollar sanction against them for discovery violations. Defendants have also appealed the District Court's denial of their motion for summary judgment on statute of limitations grounds.[1]

## I. **BACKGROUND**

None of the District Court's factual findings is challenged on Tracinda's appeal. We derive the factual portion of the following summary from the District Court's post-trial opinion. *See Tracinda Corp. v. DaimlerChrysler AG*, 364 F.

[1] The three opinions and orders under review on Tracinda's appeal are *Tracinda Corp. v. DaimlerChrysler AG*, 364 F. Supp. 2d 362 (D. Del. 2005) (post-trial findings of fact and conclusions of law); *Tracinda Corp. v. DaimlerChrysler AG*, No. 00-CV-993-JJF, 2003 WL 22769051 (D. Del. Nov. 19, 2003) (striking Tracinda's jury demand); and *In re DaimlerChrysler AG Sec. Litig.*, 247 F. Supp. 2d 579 (D. Del. 2003) (dismissing Kopper for lack of personal jurisdiction). The two opinions and orders under review on Defendants' cross-appeal are *Tracinda Corp. v. DaimlerChrysler AG*, No. 00-CV-993-JFF, 2005 WL 927187 (D. Del. April 20, 2005) (reviewing and adopting findings of Special Master, at docket item no. 944, and levying discovery sanctions against Defendants); and *In re DaimlerChrysler AG Sec. Litig.*, 269 F. Supp. 2d 508 (D. Del. 2003) (denying Defendants' motion for summary judgment on statute of limitations grounds).

Supp. 2d 362, 366-388 (D. Del. 2005). Our summary of the procedural history draws from the entire record.

## A. Factual Findings

Tracinda Corporation is a holding company, involved primarily in private investment. Its chairman, chief executive officer, and sole shareholder is multi-billionaire Kirk Kerkorian. Prior to the merger of Daimler-Benz and Chrysler Corporation in 1998, Tracinda was the largest holder of Chrysler stock at approximately 14%. Between 1992 and 1996, Kerkorian had a contentious relationship with Chrysler's managers. He frequently pressured them for stock buybacks, stock splits, and dividend increases, and he threatened to initiate a proxy fight in 1995. In 1996, Chrysler and Kerkorian settled their differences with various agreements. Among other things, Chrysler agreed to appoint a Tracinda designee, James Aljian, to the Chrysler Board of Directors.

With Aljian on Chrysler's Board, Kerkorian acquired significant inside information about the company. In 1997, Aljian reported to Kerkorian that he believed Chrysler's managers were inept and the company faced imminent financial trouble. Consequently, Kerkorian considered selling large blocks of Tracinda's Chrysler shares and also looked into the possibility of a merger partner for Chrysler. Kerkorian approached Bob Eaton, the chairman and CEO of Chrysler, to discuss a possible combination with Daimler-Benz. At that time, Kerkorian learned that Eaton had already spoken with Jurgen Schrempp, the chairman of Daimler-Benz's Board of Management, about possibly merging Chrysler with Daimler-

7

Benz.  Kerkorian consulted Jerome York, Tracinda's vice-chairman and the former chief financial officer of Chrysler. York advised Kerkorian that "now is the time" for the merger because Chrysler faced imminent financial risk.  York analyzed various issues relating to the potential merger, including the tax consequences for Tracinda, and reported his findings to Kerkorian.  Kerkorian was enthusiastic about the merger as it would provide tremendous value to Chrysler shareholders.

Schrempp and Eaton were the primary negotiators for Daimler-Benz and Chrysler.  Over the course of several meetings, the two CEOs discussed various aspects of the proposed merger, including the tax consequences of incorporating the new company as an American corporation, as a German *Aktiengesellschaft* (AG), or as a corporate entity in another nation such as Holland.  Schrempp and Eaton discussed the feasibility of joint management shared equally among executives from Daimler-Benz and Chrysler.  Eventually, the term "merger of equals" was used to describe the proposed transaction.

In a memo to Kerkorian, Aljian described the proposed management composition of the new company, DaimlerChrysler, and also characterized the merger as a "merger of equals" without elaboration.  Kerkorian was not concerned with management structure and supported the merger even before the discussions about corporate governance.  Kerkorian had some discussions with Eaton about the implementation of the merger, but they were "reasonably general" and "not on a very deep level."  Kerkorian understood that the details of the

8

merger would be incorporated into the Business Combination Agreement (BCA).

The Chrysler Board received a fairness opinion from Credit Suisse First Boston (CSFB), assessing the value of Chrysler shares in light of the proposed merger. CSFB analyzed the merger as a strategic business combination, not involving a sale of or change in control which might warrant a control premium.[2] In determining that the proposed merger was fair to Chrysler shareholders, CSFB considered sixteen previously announced or completed transactions viewed as comparable. For each earlier "merger of equals," CSFB listed one company as the "acquiror" and one company as the "target" and noted that the distribution of seats on the combined company's boards was not always equal between acquiror and target.

On May 6, 1998, the Chrysler Board of Directors unanimously approved the merger and recommended that the Chrysler shareholders do the same. On that same day, simultaneously with the execution of the BCA, Tracinda, Kerkorian, Chrysler, and Daimler-Benz executed the Stockholder Agreement (SHA), which obligated Tracinda to vote its shares in favor of the merger. The SHA contained a jury waiver clause:

---

[2] In the securities context, a "premium" refers to the "amount by which a security's market value exceeds its face value." BLACK'S LAW DICTIONARY 1219 (8th ed. 2004). A "control premium" is a "premium paid for shares carrying the power to control a corporation." *Id.*

9

> Each of the parties hereto . . . agrees to waive any right to a trial by jury with respect to any claim, counterclaim or action arising out of or in connection with this Agreement or the transactions completed hereby.

Schrempp signed the SHA on behalf of Daimler-Benz; he did not sign in his individual capacity. The agreement was negotiated at arm's length with both sides represented by counsel and other advisors.

Substantively, the SHA did not use the term "merger of equals" and contained no representations concerning corporate governance. Rather, the SHA referred to the BCA, which described the shared governance structure of the new company. Although the BCA used the term "merger of equals" and contained a lengthy definition section, the BCA did not define that term.

On August 6, 1998, the proxy statement and prospectus (Proxy) – which described the proposed merger between Daimler-Benz and Chrysler and sought shareholder approval for the transaction – was filed with the SEC. The Proxy was mailed to the Chrysler shareholders along with several attached documents, including a cover letter from Eaton, the BCA, and the CSFB opinion. The Proxy stated, among other things, that "DaimlerChrysler AG" would be the surviving entity, it would be incorporated in Germany, and it would have two headquarters (in Auburn Hills, Michigan, and Stuttgart, Germany). The Proxy explained that the German AG form was chosen primarily for its tax advantages. The Proxy described various risks relating to the merger, including the difficulties

10

inherent in integrating two large corporations from different countries and business cultures. The Proxy reiterated the terms of the BCA's corporate governance provisions, noting among other things that (1) the DaimlerChrysler Supervisory Board would consist of 5 shareholder representatives designated by Daimler-Benz, another 5 from Chrysler, and 10 labor representatives; (2) the DaimlerChrysler Management Board would initially consist of 8 members designated by Daimler-Benz, another 8 from Chrysler, and 2 members from Daimler's non-automotive group;[3] and (3) Schrempp and Eaton would serve as co-CEOs of DaimlerChrysler for three years. The Proxy included a clear standalone clause that stated these initial management structures could change after the merger was consummated. Kerkorian did not concern himself with the Proxy because he had already committed in the SHA to voting for the merger.

The Proxy repeatedly used the term "merger of equals" but did not expressly define it. The term is first used in the Proxy to describe the similar size of the Daimler-Benz and Chrysler constituencies and later used to describe the joint leadership of the new company, as provided in the BCA. The term is used in Eaton's cover letter in a similar fashion. The Proxy also used the term in reference to CSFB's fairness opinion, which compared the proposed merger to earlier strategic combinations not involving a sale of control.

---

[3] German law requires publicly-owned companies to have two boards – a board of supervisors and a board of management that is supervised by the board of supervisors.

After a media campaign by Daimler-Benz and Chrysler to foster support for the proposed "merger of equals," the Chrysler shareholders voted overwhelmingly (97%) for the merger. Chrysler's shareholders received approximately 42% of DaimlerChrysler's outstanding shares and Daimler-Benz shareholders received approximately 58%. On November 12, 1998, the merger closed consistent with the provisions in the BCA, including those relating to shared corporate governance.

For two years, the composition of the DaimlerChrysler Supervisory Board did not change; 5 of the 10 shareholder representatives were former Chrysler directors. As provided for in the BCA, the DaimlerChrysler Management Board initially consisted of 10 designees from Daimler-Benz and 8 from Chrysler. Because the Management Board acted by consensus rather than through formal votes, the initial disparity between Chrysler and Daimler-Benz designees was not significant. The managers from Chrysler were able to provide their input with regard to all operations of DaimlerChrysler and their opinions were taken seriously. The Integration Committee, a transitional body provided for in the BCA, was formed with 50% of its members from Chrysler and 50% from Daimler-Benz, pursuant to the terms of the BCA. This committee was later renamed the Shareholder Committee. Aljian was a member of the Shareholder Committee until Kerkorian directed him to resign on November 24, 2000. Consistent with the BCA, DaimlerChrysler maintained two operational headquarters, in Stuttgart and Auburn Hills.

Because both Daimler-Benz and Chrysler designees considered the 18-person Management Board to be too large,

12

approximately a year after the merger the Board was reduced to 14 members. Five of the remaining members were Chrysler designees. At the time, neither Aljian nor Kerkorian was concerned about this imbalance. The three Chrysler designees who first left the Management Board were Dennis Pawley (voluntarily retired), Ted Cunningham (asked to resign), and Thomas Stallkamp (fired). Later, on January 26, 2000, Eaton also voluntarily retired. The BCA had stated that Eaton would remain co-CEO for three years, but Eaton chose to depart early for personal reasons. In late 2000, another former Chrysler executive, James Holden, was removed from the Management Board. Holden had been placed in charge of the Chrysler brands after Eaton's retirement and was held responsible for the Chrysler Group's $500 million loss in the third quarter of 2000. Most Board members, including those designated by Chrysler, supported the removal of Holden in light of the Chrysler Group's abysmal performance. At the time of trial, only one executive from Chrysler, Tom Sidlik, remained on the Management Board; four former Chrysler directors served on the Supervisory Board.

In late 2000, the management changes at DaimlerChrysler were widely reported in the press. Because the Germans were taking over a larger share of management control in the new company, there was widespread speculation that, contrary to its billing, the merger between Daimler-Benz and Chrysler had not been a "merger of equals." Around this time, Schrempp agreed to interviews with the *London Financial Times* and *Barron's Magazine*. During these interviews, Schrempp made various statements suggesting that, in order to close the merger, he had intentionally misled the public,

13

Chrysler shareholders, and Chrysler management into thinking the Daimler-Benz/Chrysler merger was a "merger of equals," even though he had no intention of sharing control of the combined company with the Americans. For example, in the *Financial Times*, Schrempp was quoted as saying:

> Me being a chess player, I don't normally talk about the second or third move. The structure we have now with Chrysler (as a standalone division) was always the structure I wanted. We had to go a roundabout way but it had to be done for psychological reasons. If I had gone and said Chrysler would be a division, everybody on their side would have said, "There is no way we'll do a deal." But it's precisely what I wanted to do.

In *Barron's,* Schrempp was quoted as saying:

> We said in spirit it was a merger of equals, but in our minds we knew how we wanted to structure the company, and today I have it. I have Daimler, and I have divisions.

Schrempp did not deny making these statements and never issued a correction or demanded a retraction.

### B. Procedural History

A few months after these interviews were made public in late 2000, Tracinda filed suit against Daimler-Benz,

DaimlerChrysler, and DaimlerChrysler executives Schrempp, Manfred Gentz, and Hilmar Kopper[4] (collectively DaimlerChrysler).[5] In its complaint, Tracinda alleged violations of Sections 10(b), 14(a), and 20(a) of the Securities Exchange Act of 1934 (and SEC Rules 10b-5 and 14a-9 promulgated thereunder) and Sections 11, 12(a)(2), and 15 of the Securities Act of 1933. Tracinda also alleged common law fraud and civil conspiracy. Prior to trial, Tracinda voluntarily dropped its '33 Act claims. In addition, DaimlerChrysler successfully moved to dismiss Tracinda's civil conspiracy claim, and Kopper successfully moved for dismissal of the action against him, based on lack of personal jurisdiction. DaimlerChrysler unsuccessfully moved for summary judgment on statute of limitations grounds, but its motion to strike Tracinda's jury demand was granted. A bench trial commenced on the remaining claims (for common law fraud and '34 Act violations under §§ 10, 14, and 20) against the remaining defendants

---

[4] Kopper had been chairman of Daimler-Benz's Supervisory Board, and Gentz a member of its Management Board before and at the time of the merger.

[5] When discussing the substantive issues raised on appeal and cross-appeal, "DaimlerChrysler" will usually refer to Daimler-Benz, DaimlerChrysler, Schrempp, and Gentz, who were all defendants at trial and are represented by the same counsel on appeal. Although Kopper is not a party to this appeal, he has interests related to it and is represented by separate counsel. Kopper's counsel has filed a brief arguing that the District Court correctly granted Kopper's motion to dismiss for lack of personal jurisdiction.

(Daimler-Benz, DaimlerChrysler, Schrempp, and Gentz).

After a 13-day bench trial, the District Court issued a 123-page opinion with 51 pages of factual findings; the factual findings are not challenged on appeal. In its post-trial opinion, the District Court made numerous rulings, including (1) dismissing Gentz for lack of personal jurisdiction, (2) concluding that Tracinda could allege its § 14 claim, (3) entering judgment for DaimlerChrysler on Tracinda's oral misrepresentation claims under § 10 and § 14 because Tracinda failed to prove DaimlerChrysler made any false or misleading oral statements, (4) entering judgment for DaimlerChrysler on Tracinda's written misrepresentation claims under § 10 and § 14 because Tracinda failed to prove DaimlerChrysler made any false or misleading written statements,[6] (5) concluding that, even if Tracinda did show that DaimlerChrysler's oral or written statements were false or misleading under § 10 or § 14, those

---

[6] Tracinda alleged misleading and/or false written statements in (1) the BCA, (2) the Proxy, (3) Eaton's cover letter to the Proxy, and (4) Chrysler's SEC form 8-K. These statements were allegedly misleading and/or false with regard to (1) the reasons for choosing the German AG form, and the extent of the negotiations behind this decision; (2) the "merger of equals," i.e., joint management by a similar number of Daimler-Benz and Chrysler designees; (3) the risk factors of the merger, including the possibility that the joint management structure could be altered in favor of former Daimler-Benz officers immediately after the merger; and (4) the voting status of the two Management Board members representing DaimlerChrysler's non-automotive interests.

16

misrepresentations would not have been material to Tracinda, a sophisticated party with insider information, (6) entering judgment for DaimlerChrysler on Tracinda's "control person" claim under § 20, as that claim is predicated on a primary violation of the federal securities law (such as a violation of § 10 or § 14) and Tracinda failed to prove a primary violation at trial, and (7) entering judgment for DaimlerChrysler on Tracinda's common law fraud claim, as that claim requires a showing of misrepresentation, and misrepresentation was not proven at trial.

Of these rulings, Tracinda appeals only the District Court's decision with respect to the § 14 written misrepresentation claim. Specifically, Tracinda alleges that the District Court erred (1) by concluding that DaimlerChrysler's statements were not false or misleading, (2) by applying a subjective standard rather than an objective one in assessing the materiality of the alleged misrepresentations, and (3), along a similar line, by requiring Tracinda to prove reliance, which is not an element of a § 14(a) claim. Tracinda also appeals the District Court's orders granting DaimlerChrysler's motion to strike the jury demand and Kopper's motion to dismiss for lack of personal jurisdiction.[7]

On cross-appeal, DaimlerChrysler challenges two other rulings by the District Court. DaimlerChrysler asserts that the District Court abused its discretion by levying a half-million dollar discovery sanction against DaimlerChrysler absent bad faith and particularized proof of costs and fees.

_____

[7] Tracinda has not appealed the District Court's decision to dismiss Gentz for lack of personal jurisdiction.

17

DaimlerChrysler also contends that, if the District Court's judgment is not affirmed in all respects, this Court should reverse the District Court's denial of DaimlerChrysler's motion for summary judgment on statute of limitations grounds.

## II. **DISCUSSION**

Subject matter jurisdiction was premised on Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, Section 22 of the Securities Act of 1933, 15 U.S.C. § 77v; 28 U.S.C. § 1367, and 28 U.S.C. § 1331 and § 1332. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291 and § 1294(1). Tracinda's appeal and DaimlerChrysler's cross-appeal are timely under 28 U.S.C. § 2107 and FED. R. APP. P. 4(a)(1)(A) and 4(a)(3).

### A. **Jury Trial Waiver**

In granting DaimlerChrysler's motion to strike Tracinda's jury demand, the District Court concluded that the Stockholder Agreement entered into by Tracinda, Kerkorian, Daimler-Benz and Chrysler contained a broadly worded jury trial waiver that covered the claims brought by Tracinda against Defendants. The District Court determined that, in light of the business sophistication of all parties involved, the waiver was entered into knowingly and voluntarily. The District Court also found that the waiver covered the individual defendants, Schrempp and Gentz, who are not parties to the agreement.[8]

---

[8] Because Tracinda has not appealed the District Court's

(continued...)

18

The District Court based these conclusions on ordinary agency principles that we have previously applied when interpreting agreements to arbitrate.

Although Tracinda does not contest that the jury waiver covers Daimler-Benz and Chrysler, Tracinda asks us to remand for a jury trial involving both corporate and individual defendants because it claims that parallel trials involving common issues of fact and law (a bench trial for the corporate defendants and a jury trial for the individual defendants) would be unworkable and in violation of the Seventh Amendment. DaimlerChrysler argues in opposition that the District Court correctly construed the SHA by applying the jury waiver to all defendants. DaimlerChrysler contends that the District Court applied the appropriate constitutional standard for assessing the validity of the jury waiver and that it was appropriate for the District Court to look to the arbitration clause cases for ordinary agency and equitable estoppel principles.

To decide this issue, we must determine whether a valid contractual jury waiver provision, which applies to a signatory corporation, will also apply to a nonsignatory officer acting as an agent of the signatory corporation.

### 1. Non-Signatory Agents

[8](...continued)
dismissal of Gentz for lack of personal jurisdiction, the District Court's decision to apply the jury waiver to Gentz is not at issue on this appeal.

Because Tracinda has not challenged the District Court's findings that the jury waiver was valid and that Schrempp was an agent of Daimler-Benz, we are left to determine whether the District Court correctly construed the jury waiver provision to cover the non-signatory agent of the signatory principal.[9]

The right to a jury trial in a civil case is a fundamental right expressly protected by the Seventh Amendment to the United States Constitution. *Aetna, Inc. v. Kennedy*, 301 U.S. 389, 393 (1937); *Bouriez v. Carnegie Mellon Univ.*, 359 F.3d 292, 294 (3d Cir. 2004). The question of a waiver of a constitutional right, including the Seventh Amendment right to a jury trial, is a federal question controlled by federal law. *See Brookhart v. Janis*, 384 U.S. 1, 4 (1966); *In re City of Phila. Litig.*, 158 F.3d 723, 726 (3d Cir. 1998). Federal courts apply federal law in determining whether a contractual jury trial waiver is enforceable. *See K.M.C., Inc. v. Irving Trust Co.*, 757 F.2d 752-56 (6th Cir. 1985). Using federal law to determine the jury trial right assures "the uniformity in its exercise which is demanded by the Seventh Amendment." *Simler v. Conner*, 372 U.S. 221, 222 (1963) (per curiam).

Because the "right of jury trial is fundamental, courts indulge every reasonable presumption against waiver." *Aetna*, 301 U.S. at 393; *Collins v. Gov't of Virgin Islands*, 366 F.2d

---

[9] Our review of such a question of law is subject to plenary review. *See Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 7 F.3d 1110, 1113 (3d Cir. 1993) (conducting plenary review of district court's construction of contractual arbitration provision).

20

279, 284 (3d Cir. 1966). Nevertheless, as with other constitutional rights, the Supreme Court has long recognized that a private litigant may waive the right to a jury trial in a civil case. *Commodity Futures Trade Comm'n v. Schor*, 478 U.S. 833, 848-849 (1986); *In re City of Phila. Litig.*, 158 F.3d 723, 726 (3d Cir. 1998); *Nat'l Equip. Rental, Ltd. v. Hendrix*, 565 F.2d 255, 258 (2d Cir. 1977); *see also* FED. R. CIV. P. 38. To be valid, a jury waiver must be made knowingly and voluntarily based on the facts of the case. *Brookhart*, 384 U.S. at 4-5; *Hendrix*, 565 F.2d at 258; 8 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 38.14 (3d ed. 1997 & Supp. 2005); *see also First Union Nat'l Bank v. United States*, 164 F. Supp. 2d 660, 663 (E.D. Pa. 2001) (listing factors).

Tracinda does not challenge the District Court's finding that the contractual jury waiver was entered into knowingly and voluntarily. Rather, Tracinda argues that the District Court erred as a matter of law by applying an agency principle used in arbitration clause cases such as *Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 7 F.3d 1110, 1115 (3d Cir. 1993), to hold that Schrempp, a non-signatory agent, is covered by the waiver. Tracinda points out that, while all reasonable presumptions should be construed against jury waivers, *Collins*, 366 F.2d at 284, courts have construed arbitration agreements in light of the Federal Arbitration Act (FAA) policy that "any doubts concerning the scope of arbitral issues should be resolved in favor of arbitration . . .." *Pritzker*, 7 F.3d at 1114-15. Tracinda contends that, by relying on arbitration clause cases, the District Court applied a presumption in favor of jury waiver, when in fact the Seventh Amendment requires a presumption against waiver.

21

Considering that the "loss of the right to a jury trial is a necessary and fairly obvious consequence of an agreement to arbitrate," *Snowden v. Checkpoint Check Cashing*, 290 F.3d 631, 638 (4th Cir. 2002), and that the "submission of a case to arbitration involves a greater compromise of procedural protections than does the waiver of the right to trial by jury," *Gurfein v. Sovereign Group*, 826 F. Supp. 890, 921(E.D. Pa. 1993) (Pollak, J.), some commentators consider it curious that courts apply a presumption in *favor* of an arbitration clause but *against* a mere jury waiver provision.[10] Nevertheless, the tension between the cases favoring arbitration clauses and those disfavoring jury waivers does not affect the propriety of the District Court's reliance here on arbitration cases such as *Pritzker*. The reason for this is that, in *Pritzker* and similar arbitration clause cases, it is traditional agency principles of who is bound by an agreement – and not the FAA's favoring of

arbitration over a jury trial – which determined who was bound by the agreement to arbitrate.

In *Pritzker*, pension plan trustees brought an ERISA action against three defendants – a brokerage firm that traded on

---

[10] *See, e.g.,* Jean R. Sternlight, *Mandatory Binding Arbitration and the Demise of the Seventh Amendment Right to a Jury Trial*, 16 OHIO ST. J. ON DISP. RESOL. 669, 674 (2001) (contrasting courts' legal treatment of contractual jury waivers and arbitration clauses); Stephen J. Ware, *Arbitration Clauses, Jury-Waiver Clauses, and Other Contractual Waivers of Constitutional Rights*, 67 LAW & CONTEMP. PROBS. 167, 170-176 (2004) (responding to Sternlight's article).

behalf of the pension plan, the brokerage firm's wholly owned subsidiary, which provided the pension plan with investment advice, and an individual broker who serviced the pension plan's accounts. The trustees alleged violations, arising out of the cash management accounts opened with the brokerage firm. Because each cash management agreement between the pension plan and the brokerage firm contained an arbitration clause, all defendants moved to compel arbitration, despite the fact that only the brokerage firm, and not the wholly owned subsidiary or the individual broker, was a party to the cash management agreements. The District Court denied the motion to compel arbitration and the defendants appealed. On appeal, the trustees defended the District Court's ruling by urging that they could not be compelled to arbitrate because two of the three defendants – the subsidiary and the broker – were not signatories to any agreement containing an arbitration clause. We rejected this argument and reversed the order of the district court based on "traditional agency theory" principles. *Pritzker*, 7 F.3d at 1121. Specifically, we stated that, "[b]ecause a principal is bound under the terms of a valid arbitration clause, its agents, employees, and representatives are also covered under the terms of such agreements." *Id.*

Relying on *Pritzker*, the District Court rejected Tracinda's argument that the individual defendants, who did not sign the agreement containing the jury waiver, were not bound by it. The District Court held that the jury waiver covered both the signatory corporations and its nonsignatory officers and directors. This was a proper determination – not of whether the jury waiver was knowing and enforceable, Tracinda conceded that – but of who, under traditional agency principles, was

23

bound by that agreement.

The *Pritzker* rule – that nonsignatory agents may invoke a valid arbitration agreement entered into by their principal – is well-settled and supported by other decisions of this Court. *See Barrowclough v. Kidder, Peabody & Co.*, 752 F.2d 923, 938-39 (3d Cir. 1985), *overruled on other grounds by Pritzker*, 7 F.3d at 1115 n.5 (holding that contingent beneficiaries' "inchoate and derivative claims should not entitle them to maintain separate litigation in a forum that has been waived by the principal beneficiary."); *Isidor Paiewonsky Asscs., Inc. v. Sharp Props., Inc.*, 998 F.2d 145, 155 (3d Cir. 1993) (holding that an arbitration agreement between a landlord and a "head tenant" also covered a subtenant, who was not a party to the agreement, where the head tenant and subtenant had interests that were "directly related"); *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 198-99 (3d Cir. 2001) (reaffirming that "[t]raditional principles of agency law may bind a non-signatory to an arbitration agreement.")[11]

Tracinda, however, attempts to cast doubt on *Pritzker* and similar cases by citing to our decision in *Bel-Ray Co. v.*

[11]   In *DuPont*, we refused to bind a non-signatory parent corporation to the arbitration agreement of its subsidiary. 269 F.3d at 199. *DuPont* therefore presented the reverse situation of *Pritzker*, where we bound agents to their principal's arbitration agreement. The two cases are therefore distinguishable in this regard. *DuPont*, 269 F.3d at 199 ("Here, appellants seek to hold a principal to an agent's agreement and the rationale of *Pritzker* does not apply with equal force.").

24

*Chemrite Ltd.*, 181 F.3d 435 (3d Cir. 1999). In *Bel-Ray*, a New Jersey manufacturer, alleging various business torts against its South African distributor, brought suit to compel arbitration in New Jersey based on arbitration agreements entered into by the manufacturer and a predecessor of the distributor. The manufacturer also alleged claims against various officers and directors of the distributor and sought to compel arbitration against them. The distributor and the individual defendants objected to arbitration. We held that the distributor was bound to arbitrate, *Bel-Ray*, 181 F.3d at 440-443; however, we also held that the individual defendants were not bound to arbitrate as they were not signatories to the arbitration agreements, *id.* at 444-446. We discussed *Pritzker* and a similar case, *Letizia v. Prudential Bache Sec.*, 802 F.2d 1185 (9th Cir. 1986), but distinguished those cases because, like the instant case, they involved nonsignatory agents who sought to *invoke* an arbitration agreement entered into by their corporate principal, whereas *Bel-Ray* involved nonsignatory agents who sought to *avoid* their principal's agreement to arbitrate. *Bel-Ray*, 181 F.3d at 444. This is not a "distinction without a difference." *DuPont*, 269 F.3d at 202 (discussing the related concept of equitable estoppel as applied in the arbitration context and noting that courts are willing to estop a signatory from avoiding an arbitration clause but are reluctant to enforce an arbitration clause against a nonsignatory who seeks to avoid it); *see also Thomson-CSF, S.A. v. Am. Arbitration Assc.*, 64 F.3d 773, 779 (2d Cir. 1995) (same). In the instant action, Schrempp, a nonsignatory agent, seeks to *invoke* the jury waiver provision in the agreement entered into by his corporate principal, Daimler-Benz. Therefore, *Pritzker* and *Letizia* are similar to the case before us and *Bel-Ray* is distinguishable.[12]

---

[12] Tracinda also relies heavily on our decision in *Dayhoff, Inc. v. H.J. Heinz Co.*, 86 F.3d 1287, 1296 (3d Cir. 1996), where

(continued...)

Tracinda also relies on *Paracor Fin. Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151 (9th Cir. 1996) and *Hulsey v. West*, 966 F.2d 579 (10th Cir. 1992) (per curiam). However, like *Bel-Ray*, these cases are distinguishable. In *Paracor*, the Court of Appeals for the Ninth Circuit did not allow a nonsignatory third-party financier and its CEO to invoke a jury waiver provision in a purchase agreement where they were not agents of the contracting party. 96 F.3d at 1166. Clearly *Paracor* is distinguishable from *Pritzker* and the instant action, where the non-signatories *were* agents of the signatory principals. In *Hulsey*, on a loan guarantor's petition for writ of mandamus in which he sought to reinstate his jury demand, the Court of Appeals for the Tenth Circuit held that the nonsignatory guarantor was not bound by a jury waiver provision in an amendment to a loan agreement between the borrower and lender. 966 F.2d at 583. The court in *Hulsey* did not allow the signatory to enforce the waiver provision against the resistant nonsignatory who was being sued in his personal capacity. Therefore, *Hulsey* is also distinguishable.

As set out above, we conclude that, when a valid contractual jury trial waiver provision applies to a signatory corporation, the waiver also applies to nonsignatory directors and officers seeking to invoke the waiver as agents of the corporation. This rule is consistent with the concept that corporations can "act only through agents and employees." *Bel-Ray*, 181 F.3d at 444; *see also In re Mulco Prods., Inc.*, 123

[12](...continued)
we stated that arbitration clauses "can be enforced only by the signatories to those agreements," to argue that *Pritzker* has since been superceded. In *Dayhoff*, however, we noted that *Pritzker* was "not applicable to the facts before us." *Dayhoff*, 86 F.3d at 1296-97.

26

A.2d 95, 103 (Del. Sup. Ct. 1956) ("It is axiomatic that a corporation by structural necessity must act, if it acts at all, through its agents."), *aff'd sub nom. Mulco Prods., Inc. v. Black*, 127 A.2d 851 (Del. 1956);[13] *Nat'l Risk Mgmt., Inc. v. Bramwell*, 819 F. Supp. 417, 434 (E.D. Pa. 1993). If we did not allow nonsignatory agents of a signatory corporation to invoke a valid contractual jury waiver provision, such an "agreement would be of little practical value," *Trott v. Paciolla*, 748 F. Supp. 305, 309 (E.D. Pa. 1990), as "it would be too easy to circumvent the agreements by naming individuals as defendants instead of the entity" itself, *Roby v. Corp. of Lloyd's*, 996 F.2d 1353, 1360 (2d Cir. 1993). *See also Arnold v. Arnold Corp.*, 920 F.2d 1269, 1281 (6th Cir. 1990) ("[I]f appellant can avoid the practical consequences of an agreement to arbitrate by naming nonsignatory parties as [defendants] in his complaint . . . the effect of the rule requiring arbitration would, in effect, be nullified.") (quotation marks and citations omitted).[14]

---

[13] "Delaware agency law is consistent with the general common law." *Phoenix Canada Oil Co. Ltd. v. Texaco, Inc.*, 842 F.2d 1466, 1477 n.4 (3d Cir. 1988) (citing *Japan Petroleum Co. (Nigeria) Ltd. v. Ashland Oil, Inc.*, 456 F. Supp. 831, 838-841 (D. Del. 1978) (applying Restatement)).

[14] Because our holding relies on the agency principles applied in *Pritzker* and similar cases, we need not address the District Court's alternate basis for its decision, i.e., that equitable estoppel as applied in other courts of appeals' arbitration clause cases, such as *MS Dealer Serv. Corp. v. Franklin,* 177 F.3d 942 (11th Cir. 1999), precluded Tracinda's argument that the jury waiver did not cover the individual defendants. We also need not address the District Court's conclusion that, as a linguistic matter, the plain language of the jury waiver is broad enough to cover all claims "arising out of or in connection with" the SHA without limitation as to whom

(continued...)

27

## 2. Laches

Next, we address Tracinda's alternate argument that the District Court should have barred DaimlerChrysler's motion to strike Tracinda's jury demand on the basis of laches. Because laches is an equitable doctrine, we review the District Court's decision for abuse of discretion. *See Holmes v. Pension Plan of Bethlehem Steel Corp.*, 213 F.3d 124, 134 (3d Cir. 2000). In order to successfully assert the defense of laches, Tracinda must show (1) "inexcusable delay" by DaimlerChrysler, and (2) "prejudice" to Tracinda "as a result of the delay." *Santana Prods., Inc. v. Bobrick Washroom Equip., Inc.*, 401 F.3d 123, 138 (3d Cir. 2005).

DaimlerChrysler moved to strike Tracinda's jury demand approximately three years after Tracinda filed it. Tracinda had demanded a jury trial against the individual defendants but not against the corporate defendants. DaimlerChrysler's motion to strike came after the close of discovery, about six weeks before trial and approximately eight months after DaimlerChrysler filed its motions for summary judgment. When DaimlerChrysler filed its motion to strike, the District Court had not yet decided all of DaimlerChrysler's summary judgment motions.

Tracinda contends that DaimlerChrysler strategically and

_____

[14](...continued)
that action is brought against.

In addition, because we affirm the holding that the waiver applies to Schrempp, we do not need to consider Tracinda's contention that parallel bench and jury trials involving common issues of fact and law are unworkable and violate the Seventh Amendment.

inexcusably delayed filing its motion to strike and consequently caused Tracinda undue prejudice. Tracinda argues that it would have conducted discovery differently had it known that it would be trying its case to the court rather than to a jury. Tracinda asserts that it was unable to modify its trial strategy in time because the District Court struck Tracinda's jury demand only a few weeks before trial. In opposition, DaimlerChrysler contends that it did not inexcusably delay filing its motion to strike because the motion was filed in accordance with Federal Rule of Civil Procedure 39. DaimlerChrysler also argues that Tracinda could not have been prejudiced by DaimlerChrysler's delay because Tracinda knew all along that its claims against the corporate defendants were likely to be tried by the court. DaimlerChrysler points out that Tracinda never demanded a jury trial against the corporate defendants, presumably because Tracinda was fully aware that the SHA's jury waiver provision covered Daimler-Benz and Chrysler.

Parties "have a great deal of latitude on the timing of motions to strike a jury demand." MOORE'S FEDERAL PRACTICE ¶ 8-39.13. Since "a court has the power to act sua sponte at any time" under Rule 39,[15] "it follows that a court has the discretion to permit a motion to strike a jury demand at any time, even on the eve of trial." *Id*. For example, in *United States v. Schoenborn*, 860 F.2d 1448 (8th Cir. 1988), the government filed a motion to strike the defendant's jury demand one week

---

[15]    Rule 39(a) states in part:

The trial of all issues so demanded shall be by jury, unless (1) [the parties stipulate to a bench trial] or (2) the court upon motion or of its own initiative finds that a right of trial by jury of some or all of those issues does not exist under the Constitution or statutes of the United States.

29

before trial, and the District Court granted the government's motion one day before trial. *Id.* at 1455. On appeal, the defendant conceded that he had no constitutional or statutory right to a jury trial in light of the fact that the government's suit for restoration of wetlands was in equity and defendant's counterclaims were against the United States. Nevertheless, the defendant asserted that the District Court abused its discretion by striking his jury demand because the government's motion came immediately before trial and was in violation of the court's pretrial scheduling order. Citing Rule 39(a), the Court of Appeals for the Eighth Circuit rejected defendant's argument. *Id. See United States v. L.D.T. Corp.*, 302 F. Supp. 990, 991 (E.D. Pa. 1969) (rejecting laches defense to government's motion to strike defendant's jury demand where government waited five years to file its motion but defendant showed no resulting prejudice from the delay other than the "mere lapse of time").

Because a party may file a motion to strike a jury demand at any time under Rule 39(a), we conclude that DaimlerChrysler did not commit inexcusable delay by filing its motion to strike after the close of discovery. Having reached this conclusion, we

need not consider whether DaimlerChrysler's delay caused prejudice to Tracinda.[16]

---

[16] In any case, it is clear that Tracinda suffered no prejudice. Tracinda demanded a jury trial against the individual defendants, but not the corporate defendants. Therefore, Tracinda knew at the outset of its case that it would have to prepare for a non-jury trial against some of the defendants. It is highly unlikely that Tracinda, a sophisticated investment firm represented by able counsel, failed to plan for a jury trial

(continued...)

The District Court did not abuse its discretion by rejecting Tracinda's laches defense. As discussed above, Tracinda does not challenge the District Court's findings that the SHA's jury waiver is valid, that it covers the claims brought by Tracinda, and that Schrempp is an agent of Daimler-Benz, a signatory to the SHA. Therefore, in light of our holding that a nonsignatory agent of a signatory corporation may invoke a contractual jury waiver provision, we will affirm the District Court's order striking Tracinda's jury demand as to all defendants.

## B. Written Misrepresentation Under § 14

After a three-week bench trial, the District Court issued a very thorough written opinion devoting over 50 pages to findings of fact and over 70 pages to conclusions of law, only one of which is challenged on appeal, i.e., the conclusion that no misrepresentation had occurred under § 14(a) of the Securities Exchange Act of 1934 and Rule 14a-9 promulgated thereunder.

---

[16](...continued)
because it believed that the District Court would accept its argument that its claims against all defendants should be tried to a single jury, notwithstanding the clear applicability of the contractual jury waiver to the corporate defendants (which Tracinda itself appeared to have acknowledged). Additionally, approximately seven months before DaimlerChrysler filed its motion to strike, Tracinda was on notice of DaimlerChrysler's position that a bench trial was warranted. *See* 3/26/03 Letter to Court at 3 n.1. In short, even though we need not reach the issue of prejudice, it is clear that Tracinda could not have been prejudiced by DaimlerChrysler's three-year delay in filing its motion to strike.

Section 14(a) is designed "to prevent management or others from obtaining authorization for corporate actions by means of deceptive or inadequate disclosures in proxy solicitations." *Seinfeld v. Becherer*, 461 F.3d 365, 369 (3d Cir. 2006) (quotation marks omitted). Section 14(a) makes it unlawful to solicit a proxy "in contravention of such rules and regulations as the [SEC] may prescribe as necessary and appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78n(a). Rule 14a-9, which the SEC promulgated under § 14(a), provides that no proxy statement shall contain "any statement which, *at the time and in the light of the circumstances under which it is made*, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading." 17 C.F.R. § 240.14a-9(a) (emphasis added).

Pursuant to *J.I. Case v. Borak*, 377 U.S. 426 (1964), which found an implied private right of action under § 14(a), shareholders are authorized to sue for damages when a misrepresentation in a proxy statement interferes with "fair corporate suffrage." *Id.* at 431. To prevail on a § 14(a) claim, a plaintiff must show that "(1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction." *Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 144 (3d Cir. 2004) (citing *Gen. Elec. Co. v. Cathcart*, 980 F.2d 927, 932 (3d Cir. 1992) (citing *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 385 (1970))). To be actionable under Rule 14a-9, "a statement or omission must have been misleading at the time it was made; liability cannot be imposed on the basis of

subsequent events." *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330 (3d Cir. 2002). Information "is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *Shaev v. Saper*, 320 F.3d 373, 379 (3d Cir. 2003) (citing *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). In order to succeed, a § 14(a) claim that relies on the undisclosed intent and "unclean heart of a director" must also be accompanied by objective and external evidence of actual misrepresentation. *Lewis v. Chrysler Corp.*, 949 F.2d 644, 651 (3d Cir. 1991); *see also Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1095-96 (1991) (holding that § 14(a) liability may not be established on "mere disbelief or undisclosed motive without any demonstration that the proxy statement was false or misleading").

At trial, Tracinda sought to prove that DaimlerChrysler made false and/or misleading statements and/or omissions in the Proxy and associated documents with regard to four topics material to Tracinda's decision to vote in favor of the proposed merger at the stock price offered to Chrysler shareholders. First and foremost, Tracinda alleged that DaimlerChrysler made misrepresentations in the Proxy, together with Eaton's cover letter and the attached BCA, by characterizing the proposed merger as a "merger of equals." Second, Tracinda alleged that the Proxy contained misrepresentations and omissions relating to the reasons for choosing the German AG corporate form and the extent of the negotiations behind that decision. Third, Tracinda alleged that the Proxy omitted certain risk factors of the merger, including the possibility that the shared corporate governance structure provided for in the BCA could be altered in favor of former Daimler-Benz executives shortly after closing. Fourth, Tracinda alleged that a press release attached to Chrysler's SEC Form 8-K, filed to announce the proposed merger and incorporated by reference by the Proxy, falsely stated that the two DaimlerChrysler Management Board members representing non-automotive interests from the

Daimler-Benz side would be non-voting members.

After trial, the District Court concluded that Tracinda had not shown that the Proxy and associated documents contained any misrepresentations under § 14(a) and Rule 14a-9. The District Court also concluded, as a secondary basis for its decision, that even if the statements and omissions at issue were false or misleading, they had not been material to Tracinda's decision to vote its shares in favor of the proposed merger. The District Court noted that, prior to the merger, Tracinda had been focused on the economics of the transaction, not corporate governance or structural issues. The District Court also concluded that Tracinda, a highly sophisticated investor with unique access to the Chrysler Board, did not rely on the Proxy documents in deciding how to vote. The District Court noted that Tracinda had committed to vote for the merger, by way of the Stockholder Agreement, before the Proxy solicitation and 8-K release. Thus, the alleged misrepresentations in the Proxy could not have caused injury to Tracinda.

On appeal, Tracinda argues that the District Court erred (1) by concluding that the Proxy and associated documents did not contain any actionable misrepresentations, (2) by applying a subjective standard rather than an objective one in assessing the materiality of the alleged misrepresentations, and, along a similar line, (3) by requiring Tracinda to prove causation by demonstrating its reliance on the alleged misrepresentations where no such proof was required.

With regard to whether there were written misrepresentations, Tracinda argues that plenary review applies for two reasons. First, the District Court's finding of no written misrepresentation is similar to a finding made upon a Rule 12(b)(6) motion to dismiss. Second, in finding the term "merger of equals" not false or misleading, the District Court engaged in contract construction of the BCA. We do not agree, however,

that plenary review applies. Whether any particular representation in the Proxy was false or misleading is a question of fact subject to review under the clearly erroneous standard. *See Healy v. Chelsea Res., Ltd.*, 947 F.2d 611, 618 (2d Cir. 1991) ("Matters of misrepresentation, knowledge, reliance, causation, and scienter are questions of fact, and the trial court's findings as to those facts may not be set aside unless they are clearly erroneous.") (citing FED. R. CIV. P. 52(a)). Furthermore, plenary review is not appropriate here because Tracinda did not allege breach of contract; it alleged fraud and violations of the federal securities laws. The District Court engaged in *interpretation* of the BCA's corporate governance provisions in order to decipher the meaning of the term "merger of equals," as it was used in the Proxy, for the purposes of determining whether any misrepresentation had occurred. The District Court did *not* engage in *construction* of the BCA in order to determine the legal relations of the BCA signatories pursuant to that contract. *See John F. Harkins Co. v. Waldinger Corp.*, 796 F.2d 657, 659-660 (3d Cir. 1986) (noting that contract interpretation – the determination of "'what ideas [the contract] language induces in other persons'" – is a question of fact reviewed under the clearly erroneous standard, whereas contract construction – "'the determination of the legal relations of the parties'" to the contract – is a question of law reviewed under the *de novo* standard) (quoting 3 CORBIN, CORBIN ON CONTRACTS § 534 at 9 (1960)). We will review the District Court's post-trial finding of no misrepresentation for clear error. Under the clearly erroneous standard, "'a finding of fact may be reversed on appeal only if it is completely devoid of a credible evidentiary basis or bears no rational relationship to the supporting data.'" *Shire U.S., Inc. v. Barr Labs., Inc.*, 329 F.3d 348, 352 (3d Cir. 2003) (citation omitted).

Because we agree with the District Court that, as a factual matter, the Proxy and associated documents contained no misrepresentations, we need not reach the second and third

issues on appeal, regarding the proper legal standards for determining materiality and causation.

### 1. "Merger of Equals"

We begin with the most prominent alleged written misrepresentation, i.e., the characterization of the merger of Daimler-Benz and Chrysler as a "merger of equals." We must answer two questions. First, as a factual matter, was the District Court's definition of the term "merger of equals" clearly erroneous? Second, also as a factual matter, was it clearly erroneous for the District Court to find the term "merger of equals," so defined, not false or misleading?

As described by the District Court, the term "merger of equals" appears in three relevant documents: (1) the Proxy/Prospectus, which solicited Chrysler shareholder approval for the proposed merger; (2) Eaton's cover letter to the Proxy, which introduced the proposed merger and announced a special stockholder meeting; and (3) the BCA, which dictated the terms of the business combination and was attached and referred to in the Proxy.

Of these three documents, language describing a "merger of equals" appears in Eaton's cover letter as follows:

> The Chrysler Merger and the other transactions described in the attached Proxy Statement/Prospectus together will have the effect of combining the businesses, stockholder groups, managements and other constituencies of Chrysler and Daimler-Benz in a "merger of equals" transaction. DaimlerChrysler AG will bring together two companies with equal financial strength under the joint leadership of both management groups and with its common equity about evenly split between the two

shareholder groups.[17]

Eaton's cover letter demonstrates that "merger of equals" could refer to (1) the similar size and strength of Daimler-Benz and Chrysler, or (2) the joint corporate governance that was to be shared between managers from both companies – or both. Because Tracinda did not claim that Daimler-Benz and Chrysler were not equal in size or strength at the time of the merger, the District Court focused on the corporate governance aspect of the merger.

The District Court noted that the Proxy repeatedly referred to the proposed transaction as a "merger of equals" but failed to define the term. The Proxy reiterated the joint governance provisions for the combined company as set forth in the BCA and made reference to "[t]he merger of equals corporate governance structure contemplated by the [BCA]." Importantly, the District Court concluded that the Proxy made clear that these joint governance provisions were "initial" management compositions subject to change after consummation of the merger and that vacancies in the management board of the new company could be filled without regard to former corporate affiliation. The District Court emphasized that the Proxy clearly stated, in a standalone clause immediately following the summary of the BCA's corporate governance provisions, that the "Combination Agreement [BCA] contains no provision that would bar governance changes after the Transactions have been consummated."

In the BCA, the term "merger of equals" was first

---

[17]    When the SEC, after reviewing the draft Proxy, sought a clarification of the meaning of "merger of equals," outside counsel for Chrysler and Daimler-Benz referred the SEC to this paragraph of Eaton's letter.

introduced as follows:

> WHEREAS, Daimler-Benz and Chrysler desire to combine their respective businesses, stockholder groups, managements and other constituencies in a merger-of-equals transaction upon the terms and subject to the conditions of this Restated Agreement;

> WHEREAS, Daimler-Benz, Chrysler and DaimlerChrysler AG desire to make certain representations, warranties, covenants and agreements in connection with the transactions contemplated by this Restated Agreement . . ..

The District Court noted that the BCA provided that "DaimlerChrysler AG shall have a corporate governance reflecting that the transactions contemplated herein are a merger of equals." Based on this language, and the language in the Proxy and Eaton's cover letter, the District Court concluded, as a factual matter, that the term "merger of equals" was to be understood as incorporating the joint corporate governance provisions set forth in the BCA. This conclusion was firmly

grounded in the evidence presented at trial and was not clearly erroneous.

Was it clearly erroneous then for the District Court to find the term "merger of equals," as defined in relation to the BCA, not to be false or misleading? In order to make this determination, we must assess whether DaimlerChrysler followed the corporate governance structure set forth in the BCA. Pursuant to German law, the BCA provided for a DaimlerChrysler Supervisory Board responsible for appointing members to the Management Board and overseeing their operations. The BCA states that the Supervisory Board shall consist of 20 members, including 10 labor representatives

38

(pursuant to German law), 5 shareholder representatives designated by Daimler-Benz, and 5 shareholder representatives designated by Chrysler. The District Court found that this provision was followed; Tracinda does not assert otherwise. At the time the District Court issued its post-trial opinion, the Supervisory Board was about evenly split between Daimler-Benz and Chrysler designees.

DaimlerChrysler's handling of the Management Board, however, is a more contentious issue. The post-merger changes to that board's composition, as colored by Schrempp's comments in the *Financial Times* and *Barron's*, are what prompted Tracinda to bring its suit. With respect to the Management Board's composition, the BCA states (with emphasis added):

> The Management Board . . . of DaimlerChrysler AG shall consist of 18 members. *In general*, 50% of such members shall be those designated by Chrysler, and 50% of such members shall be those designated by Daimler-Benz, and there will be two additional members with responsibility for Daimler-Benz's non-automotive businesses. For three years following the Effective Time, Jurgen E. Schrempp and Robert J. Eaton shall be the Co-CEOs and Co-Chairmen . . . of the Management Board . . . of DaimlerChrysler AG and members of the Office of the Chairmen of DaimlerChrysler AG. If any person designated as a member of the Office of the Chairmen or the Management Board of DaimlerChrysler AG ceases to be a full-time employee of either Chrysler or Daimler-Benz at or before the Effective Time, Daimler-Benz, in the case of any such employee of Daimler-Benz on the date hereof or any such employee to be designated by Daimler-Benz, or Chrysler, in the case of any such employee of Chrysler on the date hereof or any such employee to be designated by Chrysler, shall

designate another person to serve in such person's stead. As highlighted by the District Court, the 50-50 split

between Daimler-Benz and Chrysler designees was meant to be understood in general, initial terms. The BCA provided for the right of Chrysler and Daimler-Benz to replace a designee to the Management Board or Office of the Chairman if that individual ceased to be a full-time employee of the company *prior* to the effective date of the merger, but no such provision exists for the departure of executives *after* the merger closed. Other than the time frames placed on the co-chairmanship, no provision of the BCA specified how long the composition of the Management Board was to last after the merger closed. Indeed, the Proxy explicitly stated that the Management Board members chosen by Daimler-Benz and Chrysler pursuant to the BCA were "initial" designees. Further, as noted by the District Court, the BCA provides that the post-merger governance structure is based on "recommendations" and is subject to the powers of the DaimlerChrysler shareholders and the Supervisory and Management Boards. As made clear in the Proxy, the BCA "contains no provision that would bar governance changes after the [merger has] been consummated." Therefore, the District Court found that the post-merger changes to the Management Board composition, resulting in more Daimler-Benz designees sitting on the Board than Chrysler designees, were permitted under the BCA. The District Court explicitly found that "[t]he Merger closed consistent with the provisions in the BCA." *Tracinda Corp. v. DaimlerChrysler AG*, 364 F. Supp. 2d 362, 380 (D. Del. 2005).

Consequently, the District Court concluded that Tracinda had not proved, by a preponderance of the evidence, a misrepresentation based on use of the term "merger of equals," as defined by the BCA's corporate governance provisions. The District Court explained its decision as follows:

40

Although the BCA and the Proxy/Prospectus set forth proposals concerning the numbers of individuals on the Management Board and the Supervisory Board from each side of the transaction, those documents do not require the proposed compositions to last for any specific period of time, reiterate that the proposed compositions are initial compositions, state that the proposed compositions are recommendations subject to the rights and approval of the shareholders and the Supervisory Board, and make clear that changes to the corporate governance structure are not barred after consummation of the transaction.

*Id.* at 409. This finding was firmly grounded in the evidence presented at trial and was not clearly erroneous.

In affirming this conclusion of the District Court, we reject the primary argument pressed by Tracinda in its briefs and during oral argument. Tracinda vehemently insists that the District Court's conclusion that the BCA corporate governance provisions "apply only until the moment in time when DaimlerChrysler was created . . . . renders the entire proxy solicitation process . . . meaningless, except as a means to deceive" and "also renders the corporate governance provisions of the BCA illusory." In effect, Tracinda argues that due to the fact that the composition of the Management Board was gradually altered in favor of former Daimler-Benz executives in the years following the merger, we should set aside the District Court's finding that the BCA's corporate governance provisions were complied with. We reject this argument because, as noted above, the BCA permitted these changes, and the Proxy expressed this point in clear terms.

Moreover, as noted by the District Court, Tracinda's insistence upon a Management Board perpetually divided

41

between 5 Daimler-Benz designees and 5 Chrysler designees is potentially unworkable and legally flawed. Upon closing, Daimler-Benz and Chrysler merged into one new company, at which point there were no longer two independent companies to make future board membership designations. In addition, a rigid quota system based on nationality or former corporate affiliation might have prevented the Supervisory Board from making personnel decisions in the best interests of the shareholders, thus interfering with its fiduciary duty.

We also reject Tracinda's argument to the extent it suggests that the District Court erred by drawing on the BCA's corporate governance provisions in defining "merger of equals." Tracinda does not identify any alternate source that might have better assisted the District Court in defining the term "merger of equals," other than perhaps Tracinda's own notion of fairness. Even if Tracinda had identified a suitable alternate source, that would not necessarily render the District Court's chosen

definition clearly erroneous. The court's definition is based on the evidence before it.

Indeed, even if we were to define "merger of equals" in general terms of shared or joint control, without reference to specific BCA provisions, we would still reject Tracinda's appeal in light of the District Court's findings of a degree of shared control by the managers from Daimler and Chrysler: "The Management Board did not take formal votes, but acted by consensus;" "[f]ormer Chrysler executives who served on DaimlerChrysler's Board of Management had the opportunity to provide input into all the operations of DaimlerChrysler, including the former Daimler-Benz divisions;" and "their views and opinions were taken seriously." *Tracinda Corp.*, 364 F. Supp. 2d at 382.

Because we will affirm the District Court's factual finding that no written misrepresentation occurred in the Proxy solicitation, we need not consider the effect of Schrempp's comments to the *Financial Times* and *Barron's*, since intent to deceive without actual misrepresentation is insufficient to prevail on a § 14(a) claim. *See Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1095-96 (1991); *Lewis v. Chrysler Corp.*, 949 F.2d 644, 651 (3d Cir. 1991); *see also In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330 (3d Cir. 2002) (to be actionable under Rule 14a-9, "a statement or omission must have been misleading at the time it was made; liability cannot be imposed on the basis of subsequent events").

### 2. Other Claims

Next, we briefly address Tracinda's remaining claims of misrepresentation in the Proxy regarding (1) the reasons for and negotiations behind the selection of the German AG form for DaimlerChrysler, (2) risk factors relating to the potential for post-merger corporate governance changes in favor of Daimler-Benz designees, and (3) the voting status of the two Management Board members representing Daimler-Benz's non-automotive interests.

*German AG Form*.  At trial, Tracinda argued that the Proxy misrepresented (1) the reasons for organizing DaimlerChrysler as a German *Aktiengesellschaft* (AG), and (2) the extent of the negotiations behind this decision.

With regard to the first claim, Tracinda argued that the Proxy falsely or misleadingly stated that the AG form was chosen "because it best achieved both parties' objectives" – which Tracinda argued related to the "post-merger governance structure of a 'merger of equals'" – when in fact, according to

Tracinda, the AG form was chosen to facilitate Schrempp's secret takeover plan, or perhaps appease Daimler-Benz shareholders. The District Court rejected this argument and found no such misrepresentation. The District Court observed that the Proxy did not define the "parties' objectives" as the "post-merger governance structure of a 'merger of equals.'" Rather, the District Court found that the Proxy clearly linked the "parties' objectives" to structural efficiency and favorable tax consequences for the Daimler-Benz, Chrysler, and DaimlerChrysler constituencies. After reviewing the language of the Proxy and the evidence presented at trial, including testimony of both American and German executives of DaimlerChrysler that was consistent with the Proxy, the District Court found that tax benefits were in fact the real reason for choosing the AG form; therefore, no misrepresentation occurred.

On appeal, Tracinda simply disagrees with the District Court's factual finding and reiterates its argument that it was erroneous to link the "parties' objectives" to tax consequences, rather than to the shared corporate governance resulting from a "merger of equals." Tracinda's argument is belied by the plain language of the Proxy. As noted by the District Court, the Proxy explains the reasons for choosing the AG form as follows (with emphasis added):

> Over the course of their discussions, the parties considered various alternative transaction structures for the combination of the two enterprises, including through (1) a newly incorporated U.S. company, (2) a company incorporated in The Netherlands and (3) either a newly organized German Aktiengesellschaft or Daimler-Benz itself. The simplest structural solution, a direct merger of Daimler-Benz and Chrysler, was not possible under German law. The parties believed that the structure for the Transactions was the preferable alternative to a combination through a newly-incorporated U.S. company

44

or a company incorporated in The Netherlands because *this structure was believed to be the most tax efficient for the combined entity on an ongoing basis, could be tax-free to Chrysler's U.S. stockholders and to Daimler-Benz' German stockholders* and was the only structure which would enable the elimination of all minority stockholders of Daimler-Benz and Chrysler thereby creating a parent corporation with one group of stockholders holding a single publicly traded equity security. The structure for the Transactions was therefore selected because it best achieved both parties' objectives.

The Proxy clearly explained that the AG form was chosen for its tax benefits, and the testimony of executives from both sides of the merger supported the Proxy's explanation. Therefore, we will affirm the District Court's finding of no misrepresentation as to the reasons for organizing DaimlerChrysler as a German AG.

With regard to its second claim, Tracinda argued at trial that the Proxy misrepresented the extent of the negotiations behind the selection of the AG form. Tracinda claimed that the Proxy gave the false impression that the negotiations were not hotly debated and did not extend beyond March 2, 1998, even though evidence presented at trial suggested otherwise. The District Court rejected this argument. The District Court noted that the "Background of the Transactions" section of the Proxy repeatedly referred to these negotiations and clearly explained that they occurred on and beyond April 7, 1998. On appeal, Tracinda simply asks us to second-guess the factual findings of the District Court. Finding no clear error, we decline to do so.

*Risk Factors*. At trial, Tracinda argued that the Proxy misrepresented the risk factors associated with the proposed merger by failing to mention that (1) absent a combination with

Daimler-Benz, Chrysler might not survive the next economic downturn in the automotive industry, and (2) the DaimlerChrysler Supervisory Board could, at any time after the merger closing, remove all former Chrysler executives from the Management Board and replace them with former Daimler-Benz executives.

With regard to the first allegedly omitted risk factor, relating to the consequences of voting *against* the merger, the District Court concluded that it need not be included because the Proxy solicited votes in *favor* of the merger, and therefore the Proxy's risk factor section was designed to warn Chrysler shareholders of the dangers of voting *for* the merger, not against it. In any case, the District Court found that the Proxy addressed the likelihood of future consolidation in the automobile industry in other sections. On appeal, Tracinda fails to demonstrate how this finding was clear error, or how an allegedly omitted risk factor relating to the danger of voting against the merger could possibly support its § 14(a) claim based on alleged misrepresentations and omissions that induced it to vote in favor of the merger.

With regard to the second allegedly omitted risk factor, relating to possibility of post-merger changes to the shared corporate governance set forth in the BCA, the District Court concluded that this risk was adequately explained because:

> the Proxy/Prospectus explicitly disclosed that (1) the Merger's governance provisions did not limit the Supervisory Board's duties and responsibilities under German law; (2) that the Supervisory Board had the power to remove members of the Management Board and (3) the BCA contained "no provisions that would bar governance changes after the [DaimlerChrysler] Transactions have been consummated."

46

*Tracinda Corp. v. DaimlerChrysler AG*, 364 F. Supp. 2d 362, 413 (D. Del. 2005) (citations to Proxy omitted). On appeal, Tracinda recycles various arguments, in slightly different form, that we have already rejected in the context of the alleged "merger of equals" misrepresentation, discussed *supra*, Section II.B.1. In light of the explicit Proxy language clearly describing the possibility of future corporate governance changes, we conclude that Tracinda has failed to demonstrate clear error.

*SEC Form 8-K*. DaimlerChrysler admits that a May 6, 1998, press release attached to a Chrysler SEC Form 8-K filing erroneously stated that the two Daimler-Benz non-automotive designees to the Management Board would be non-voting members. At trial, Tracinda argued material misrepresentation under § 14(a) because the Proxy incorporated the 8-K by reference without explicitly identifying this error. The District Court rejected this argument because of the Proxy's disclaimer that:

> Any statements contained herein, or in a document incorporated or deemed to be incorporated by reference herein, shall be deemed to be modified or superseded for purposes of this Proxy Statement/Prospectus to the extent that a statement herein, or in any other subsequently filed document that is or is deemed to be incorporated by reference herein, modifies or supersedes such previous statement. Any statement so modified or superseded shall not be deemed to constitute a part hereof except as so modified or superseded.

The District Court also reviewed the Proxy's thorough discussion of the BCA's corporate governance provisions and found no mention of the non-automotive Management Board members as non-voting. Finally, the District Court observed that the DaimlerChrysler Articles of Association, attached to the Proxy, made no reference to any non-voting members of the

47

Management Board. Therefore, the District Court concluded that the 8-K failed to establish misrepresentation in the Proxy. On appeal, Tracinda expresses its disagreement with this factual finding but fails to establish clear error.

For the above stated reasons, we will affirm the District Court's finding that the Proxy and associated documents contained no misrepresentations under § 14(a) and Rule 14a-9.[18]

---

[18] We do not reach Tracinda's appeal of the District Court's order granting Kopper's motion to dismiss for lack of personal jurisdiction because that appeal is moot. Even if we were to conclude that the District Court had jurisdiction over Kopper (which we do not), Tracinda would be precluded from further pursuing the claims it brought against Kopper because each such claim has been finally resolved in Defendants' favor. *See Surrick v. Killion*, 449 F.3d 520, 526 (3d Cir. 2006) ("'[F]ederal courts are without power to decide questions that cannot affect the rights of litigants in the case before them.'") (citing *DeFunis v. Odegaard,* 416 U.S. 312, 316 (1974)).

At the relevant times, Kopper was the chairman of the Supervisory Board for Daimler-Benz and DaimlerChrysler. Tracinda's complaint asserted three claims against Kopper: two claims for control person liability (under § 20(a) of the '34 Act and § 15 of the '33 Act), and one claim for conspiracy to defraud. None of these claims are before us on appeal. The District Court dismissed Tracinda's conspiracy claim in *Tracinda Corp. v. DaimlerChrysler AG*, 197 F. Supp. 2d 86 (D. Del. 2002), and Tracinda has not appealed that decision. Shortly before trial, Tracinda voluntarily dismissed all of its '33 Act claims, including its § 15 claim. The District Court held a bench trial on all remaining claims (i.e., for common law fraud and violations of § 10(b), § 14(a), and § 20(a) of the '34 Act), after

(continued...)

48

[18](...continued)
which judgment was entered for Defendants on all counts. Tracinda's notice of appeal purported to challenge the District Court's entire post-trial decision, but only the § 14(a) claim was addressed in Tracinda's opening brief. *See In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 286 n.17 (3d Cir. 2006) ("[I]t is well-settled in this court that 'an appellant's failure to identify or argue an issue in his opening brief constitutes waiver of that issue on appeal.'") (citation omitted). Therefore, every claim brought against Kopper (under § 20, § 15, and for conspiracy) has been resolved against Tracinda, and each such claim has been rendered finally resolved by Tracinda's waiver of those issues on appeal.

Tracinda argues that its claim against Kopper under § 20 has not been waived on appeal by virtue of its § 14 claim, which was addressed in Tracinda's opening brief. Although a primary violation of § 14(a) can be a predicate to control person liability under § 20(a), Tracinda's complaint makes clear that its § 20(a) claim against Kopper was based on alleged violations of § 10(b), not § 14(a). *See* Compl. ¶ 48 ("Messrs. Schrempp, Gentz and Kopper knew or should have known of the violations of Section 10(b) of the Exchange Act as set forth in the First Claim for Relief, above."). In any case, even if we were to read Tracinda's § 20(a) claim as alleging an underlying § 14(a) violation (which is dubious, in light of the clear language cited above), the appeal of Kopper's dismissal would still be moot, as we have already affirmed the District Court's finding of no liability under § 14(a). We have also affirmed the District Court's decision to strike the jury demand and thus Tracinda is not entitled to retry its entire case to a jury. Therefore, the District Court's post-trial finding of no liability on all counts is finally resolved. Having failed to establish any primary
(continued...)

49

## C. Discovery Sanctions

Because we have rejected Tracinda's appeal in its entirety and will affirm the District Court's final judgment in favor of DaimlerChrysler, we need not address DaimlerChrysler's claim on cross-appeal that the District Court erred in denying DaimlerChrysler's motion for summary judgment on statute of limitations grounds. We therefore proceed to the final issue before us – DaimlerChrysler's claim on cross-appeal that the District Court erred by awarding Tracinda $556,061 in costs for DaimlerChrysler's late document production, which violated the District Court's scheduling order. An order granting sanctions is reviewed for abuse of discretion. *Saldana v. Kmart Corp.*, 260 F.3d 228, 236 (3d Cir. 2001). For the reasons that follow, we find no abuse of discretion and will affirm the order, awarding costs.

### 1. Background[19]

---

[18](...continued)
violations of the federal securities laws, Tracinda has necessarily failed to establish control person liability as well. *Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 159 n.21 (3d Cir. 2004).

If we were to find jurisdiction over Kopper and remand, the District Court would have to dismiss Kopper for lack of any outstanding claims against him. Therefore, Tracinda's appeal of Kopper's dismissal for lack of personal jurisdiction is moot.

[19]     We derive our factual summary from the District Court's memorandum opinion and order granting Tracinda's motion for

(continued...)

Pursuant to the District Court's Rule 16 pretrial scheduling order, discovery closed on January 15, 2003. Nearly a year later, on December 16, 2003 – the eve of the last day of trial – DaimlerChrysler informed the District Court that it had failed to produce 61 pages of documents responsive to Tracinda's earlier discovery requests. DaimlerChrysler had just discovered that these documents had not been produced as required. Because the District Court found that these documents were "highly relevant to issues raised throughout this litigation," the District Court recessed trial. *See Tracinda Corp. v. DaimlerChrysler AG*, No. 00-CV-993-JFF, 2005 WL 927187, at *2 (D. Del. April 20, 2005). DaimlerChrysler provided copies of the 61 pages to Tracinda and, after further investigation, produced 6 more pages a few days later.

The sixty-seven pages of documents came from the files of Gary Valade, Chrysler's CFO at the time of the merger and later a member of DaimlerChrysler's Management Board. The documents consisted primarily of Valade's handwritten notes taken during the merger negotiations; Valade had been one of the principal negotiators for Chrysler. After considering the various requests of the parties and reviewing Valade's notes, the District Court referred the matter to a special master for an evidentiary hearing and determination of the reasons for DaimlerChrysler's delayed production. The Special Master had been responsible for managing discovery throughout the course of this complex litigation and was very familiar with the case.

---

[19](...continued)
sanctions (at *Tracinda Corp. v. DaimlerChrysler AG*, No. 00-CV-993-JFF, 2005 WL 927187 (D. Del. April 20, 2005)) and the Special Master's report (at docket item no. 944), which was adopted by the District Court (by 4/11/05 Order, at docket item no. 1099). Our summary of the procedural history draws from the entire record.

On December 22, 2003, the Special Master conducted a full-day hearing at which live testimony and exhibits were presented regarding the circumstances giving rise to the production delay. On January 12, 2004, the Special Master issued a 22-page written report making detailed factual findings, which we summarize as follows:

On December 15, 2003, shortly before he was to testify at trial, Valade flew to Wilmington, Delaware. He brought with him one of two binders he kept, containing various documents relating to the Daimler-Benz/Chrysler merger negotiations. Included in the binders were his handwritten notes of the details of the key pre-merger meetings. During the flight, Valade reviewed the contents of the binder and found a page of meeting notes that he believed was helpful to DaimlerChrysler's trial position. When Valade arrived in Wilmington, he showed the page to the attorneys from Skadden, Arps, Slate, Meagher & Flom LLP, one of the law firms representing DaimlerChrysler. The Skadden attorneys immediately investigated whether the page had been provided to Tracinda during discovery. After searching Skadden's electronic database of produced documents, they concluded that it had not. Skadden then began an investigation to determine why not. In Michigan, Skadden attorneys located the other binder which Valade had used to collect materials and handwritten notes during the merger negotiations. Skadden discovered that a substantial portion of the material from Valade's two binders had been produced to Tracinda, but several dozen pages of handwritten notes had not. The next day, on December 16, Skadden reported the problem to the District Court.

In preparing for this case, Skadden had followed its usual practice for a large document production. Various safeguards were employed, including the creation of two sets of copies of all potentially discoverable material (approximately 2.5 million documents) to be stored at separate locations in New York and

New Jersey. Material collected from DaimlerChrysler's Michigan headquarters, including Valade's office, was duplicated in Auburn Hills by an outside copy vendor. The original documents were returned to DaimlerChrysler's offices. The set of copies was sent to New York City, where it was duplicated again by a different copy vendor. The first, "inviolate" set of copies – the set of copies received from Michigan – was stored in Jersey City; it remained untouched. The second "working" set, the copies made from the "inviolate" set, was kept at Skadden's New York City offices where Skadden attorneys reviewed the documents to determine whether they should be produced. Approximately 250,000 documents were deemed to be responsive to Tracinda's discovery requests and not to be protected by the attorney-client privilege. The remaining 2.25 million documents were classified and stored separately as either unresponsive or privileged. A New York City copy vendor scanned the 250,000 producible documents into a searchable electronic database for Skadden's internal use and made a set of hard copies that was delivered to Tracinda.

Between December 15 and 22, Skadden conducted an elaborate search of both the inviolate and working sets of documents. The working set was more difficult to examine because it was no longer intact, having been divided up based on responsiveness and privilege. As a result of the search, Skadden determined that copies of the material from Valade's binders appeared in two separate boxes in the inviolate set. Box 261 contained an incomplete set of the binder material, i.e., all of the pages first produced to Tracinda but none of the 67 tardily produced pages. Box 363, however, contained a more complete set, including all the earlier produced pages and almost all of the 67 tardily produced pages.

Testimony, presented at the evidentiary hearing, revealed that Box 363 had been reviewed and processed during

53

Skadden's document review. Nevertheless, the 67 pages of Valade's notes were not included in the set of 250,000 documents produced to Tracinda. The 67 pages were also not included in Skadden's privilege log or its collection of unresponsive documents. In other words, the 67 pages were present in Box 363 of the inviolate set but were nowhere to be found in the working set.

Having made the above factual findings, the Special Master identified two possible reasons for DaimlerChrysler's failure to produce the 67 pages of Valade's notes. First, the Special Master noted that the copy vendor in Auburn Hills apparently erred by creating two separate copies – both incomplete to varying degrees – of the material in Valade's binders, which probably led to some confusion during Skadden's document review. Second, the Special Master noted that the copy vendor in New York City, responsible for copying the set of documents sent there, might have failed to duplicate the entire contents of Box 363, including the missing Valade notes. This might explain how Skadden could have reviewed and processed Box 363 of the working set without producing the missing notes or placing them in either its privilege log or its collection of non-responsive documents.

Despite the apparent improbability that two separate copy vendors in different cities could each make copying mistakes with the same group of documents, the Special Master concluded in his report that such a coincidence was in fact "the most likely explanation for the late production" of the 67 pages of Valade's notes. The Special Master concluded that, while there was "no definitive answer why the complete set of [Valade's binders] were not produced" and "no explanation for the coincidence" noted above, there was nevertheless "no evidence that the Skadden attorneys or Mr. Valade intentionally or in bad faith withheld the missing documents from production to the plaintiffs." The Special Master did not clearly address

54

whether DaimlerChrysler or Skadden had acted negligently.

Tracinda filed objections to the Special Master's report to the extent it found coincidental copying error to have caused DaimlerChrysler's late production. Tracinda also filed a motion for sanctions requesting that (1) Valade be barred from testifying at trial about the subject matter of his notes, except in response to questions about the notes by Tracinda and the Court; (2) Jurgen Schrempp and Thomas Stallkamp be recalled to testify at trial; and (3) DaimlerChrysler be ordered to pay Tracinda all of its fees and costs incurred from December 16, 2003, through the conclusion of trial. At a teleconference on January 30, 2004, the District Court denied Tracinda's request to limit Valade's testimony. The District Court did not need to rule on Tracinda's second request because DaimlerChrysler agreed to have Schrempp and Stallkamp recalled. The District Court indicated that it would grant Tracinda's request for costs and fees, with the precise amount to be determined after trial. Consequently, the District Court postponed ruling on Tracinda's objections to the Special Master's report. Trial resumed on February 9, 2004, and concluded two days later.

On April 7, 2005, the District Court issued its post-trial opinion and order, entering final judgment for DaimlerChrysler on all remaining counts. Shortly thereafter, the District Court overruled Tracinda's objections to the Special Master's report, adopted its findings and awarded Tracinda $556,061 for the costs and fees it expended as a result of DaimlerChrysler's late production. Even though the Special Master found no bad faith or intentional misconduct by DaimlerChrysler or Skadden – a finding the District Court accepted – the District Court concluded that the imposition of monetary sanctions was permitted and warranted in this case under FED. R. CIV. P. 16(f). In so concluding, the District Court cited the inconvenience and expense DaimlerChrysler caused Tracinda and the court, the particular relevance of Valade's tardily produced notes, and, in

light of the advanced stage of the litigation, the irremediable prejudice suffered by Tracinda. Like the Special Master, the District Court did not clearly address whether DaimlerChrysler or Skadden had acted negligently in failing to produce all of Valade's notes during discovery. The District Court also concluded that the sanction amount awarded was reasonable. The District Court rejected DaimlerChrysler's argument that Tracinda's attorney's declaration was insufficient to demonstrate the reasonableness of Tracinda's fee request. The District Court accepted the declaration's summary of the hours expended by Tracinda's attorneys (and their corresponding hourly fees) as a result of DaimlerChrysler's late production, even though the declaration did not precisely detail the specific tasks the attorneys performed or attach their actual billing records.

On appeal, DaimlerChrysler contends that the District Court abused its discretion by imposing sanctions absent a finding of bad faith or intent. DaimlerChrysler argues that Rule 16(f) sanctions are not designed to punish or deter blameless conduct and therefore the Court's decision was "unjust" under the Rule. Alternatively, DaimlerChrysler argues that the District Court abused its discretion by awarding an unreasonably large sanction award that was not sufficiently supported by particularized evidence.

As noted above, we review the District Court's decision for abuse of discretion. "An abuse of discretion is a clear error of judgment, and not simply a different result which can arguably be obtained when applying the law to the facts of the case." *SEC v. Infinity Group Co.*, 212 F.3d 180, 195 (3d Cir. 2000) (quotation marks and citations omitted). A court abuses its discretion if its decision to impose sanctions is based upon an incorrect legal standard or clearly erroneous factual findings. *Bowers v. Nat'l Coll. Athletic Ass'n*, 475 F.3d 524, 538 (3d Cir. 2007) (citing *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384,

405 (1990)).

## 2. Sanctions Under Rule 16(f)

Federal Rules of Civil Procedure 16(a) through (e) set forth standards for pretrial conferences, case management, and scheduling orders.  Rule 16(f), which authorizes sanctions for violations of pretrial orders issued pursuant to this Rule, states in relevant part (with emphasis added):

If a party or party's attorney *fails to obey* a scheduling or pretrial order, . . . the judge, upon motion or the judge's own initiative, may make such orders with regard thereto as are just, and among others any of the orders provided in Rule 37(b)(2)(B), (C), (D).[20]  In lieu of or in addition to any other sanction, the judge *shall require* the party or the attorney representing the party or both to pay the reasonable expenses incurred because of any noncompliance with this rule, including attorney's fees, *unless* the judge finds that the noncompliance was substantially justified or that other circumstances make an award of expenses unjust.

As the plain language of Rule 16(f) indicates, monetary sanctions for noncompliance with Rule 16 pretrial orders are required and appropriate absent a showing that the violation was "substantially justified" or the award of expenses is "unjust" under the circumstances of the case.  *See* 3 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE - CIVIL § 16.91[2][b] (3d ed. 1997 & Supp. 2006).

---

[20]  These sections of Rule 37 authorize a district court to impose a variety of non-monetary litigation sanctions (including dismissing the case, striking claims or defenses, and barring evidence) for failures to make disclosures or cooperate in discovery.

Because there was no dispute that the tardily produced Valade notes were relevant to the case and clearly within the scope of Tracinda's earlier discovery requests, DaimlerChrysler does not contend that its late document production, which violated the District Court's scheduling order, was "substantially justified." *See Fitz, Inc. v. Ralph Wilson Plastics Co.*, 174 F.R.D. 587, 591 (D.N.J. 1997) (noting that, in the context of Rule 37 sanctions, "substantial justification" occurs when there is a "genuine dispute concerning compliance") (citing *Pierce v. Underwood*, 487 U.S. 552, 565 (1988)). Instead, DaimlerChrysler argues that the District Court's imposition of Rule 16(f) expense sanctions, absent a finding of bad faith or intent, renders the sanction "unjust" and thus barred by the Rule. In the alternative, DaimlerChrysler argues that such a sanction requires at least a finding of negligence. DaimlerChrysler contends that the Special Master and the District Court found no negligence on the part of DaimlerChrysler or its attorneys – only negligence on the part of the outside copy vendors – and therefore the sanction awarded was "unjust" under Rule 16(f).

"Unjust" can be variously defined as "unfair," "unreasonable," "inequitable," or "harsh." These definitions do not, in and of themselves, contain a requirement of intent or negligence. Instead, "unfair," "unreasonable," "inequitable" and "harsh" invite a consideration of the degree of the sanction in light of the severity of the transgression which brought about the failure to produce. Certainly, whether a failure to produce is intentional, negligent, or inadvertent is a significant factor in assessing the severity of the transgression. On the other hand, a failure to produce documents that is rectified many months before trial causes less prejudice and is less expensive to rectify than a failure to produce relevant documents that is discovered on the eve of the last day of a long and complicated trial. Thus, the circumstances and timing of the eventual production of the documents is a correlative factor for the district court to consider, along with the nature of the failure to produce, in

determining the nature and severity of the sanction. A $500,000 assessment of costs for an inadvertent failure to product documents would be unjust if the documents were produced two months after the close of discovery but six months before trial is to begin. The failure to produce here, however, occurred eleven months after the close of discovery and, even more significantly, on the eve of the last day of a long trial. This case was extraordinarily complex and the preparations for trial, particularly in light of the huge number of documents produced, had been immensely time consuming. Nevertheless, on the eve of the last day of trial, Tracinda was required, through no fault of its own, to reexamine its trial strategy, reevaluate its examination of various witnesses, prepare for re-examination of several witnesses, and redevelop its cross-examination of Valade. In addition, as noted by the District Court, the late production prejudiced Tracinda's whole trial preparation strategy by its effect on Tracinda's "ability to develop its case, including most particularly its impact on Tracinda's decision of who to depose, the order of depositions and the substance and conduct of the trial prior to the revelation of the documents." *Tracinda Corp.,* 2005 WL 927187 at *3.

Even though the Special Master's report found that "[t]here was no evidence in the record . . . that the Skadden attorneys had any part in [the copying] mix-up," the obligation to produce the documents was DaimlerChrysler's and Skadden's. As between DaimlerChrysler and Tracinda, if anyone is to be charged with the significant expenses that Tracinda incurred because of the late and prejudicial production, it does not seem unjust that DaimlerChrysler should bear the expense. Indeed, the District Court noted in its sanctions opinion that, "regardless of the reason for the failure to produce these documents, the fault for this production failure and the related delays and proceedings which followed, lies with Defendants." *Id.* at *3. We conclude that, under the extreme circumstances of this case, the District Court acted within its

discretion by imposing Rule 16(f) expense sanctions.

This conclusion is consistent with the very broad discretion which district courts have to "use sanctions where necessary" to ensure compliance with pretrial orders; this facilitates the "expeditious and sound management of the preparation of cases for trial." *In re Sanction of Baker*, 744 F.2d 1438, 1440 (10th Cir. 1984) (en banc). Although a finding of bad faith is generally required for a court to impose sanctions pursuant to its inherent authority, *see Roadway Express, Inc. v. Piper*, 447 U.S. 752, 765-766 (1980) (discussing a court's power to impose sanctions before 1983, when Rule 16 was amended to add subdivision (f)); *Martin v. Brown*, 63 F.3d 1252, 1265 (3d Cir. 1995), no express requirement of intent or negligence exists in the language of Rule 16(f).

DaimlerChrysler argues, however, that the purpose of Rule 16(f) is to punish and deter egregious misconduct, not innocent mistakes, and therefore the imposition of sanctions in this case constituted an "unjust" award. In support of this proposition, DaimlerChrysler cites to two cases, *Williams v. Saint-Gobain Corp.*, No. 00-CV-502E, 2002 WL 1477618, at *2 (W.D.N.Y. June 28, 2002) and *Flaherty v. M.A. Bruder & Sons, Inc.*, 202 F.R.D. 137, 141-142 (E.D. Pa. 2001), where motions for sanctions were denied because, among other things, the discovery violations at issue were inadvertent.[21] As we discuss *supra*, however, the standard we find relevant in defining

---

[21]    DaimlerChrysler also cites to *Zambrano v. City of Tustin*, 885 F.2d 1473, 1478 (9th Cir. 1989), where the court of appeals vacated a sanction award that was based on "simple negligence." *Zambrano* is inapposite, however, as it did not address Rule 16(f); the decisions under review in that case relied upon the district court's local rules, not the Federal Rules of Civil Procedure. *Id.* at 1477 n.9 and 1481.

"unjust" is the contrast between the nature of the violation of Rule 16 and the impact on the parties caused by the delay. Therefore, the fact that the party with the obligation to produce documents may have been negligent is a factor to consider. Nevertheless, even if the failure to produce has been inadvertent, sanctions may be called for under Rule 16(f) if the impact is severe on the party who was due the discovery. *See* MOORE'S FEDERAL PRACTICE § 3-16.92[2] (noting that one of the relevant factors in considering whether to impose Rule 16(f) sanctions is "the nature and consequences of the misconduct"). The prejudice caused by DaimlerChrysler's discovery violation was significant because the effect on Tracinda's trial preparation could not be remedied and because the delay imposed substantial costs on Tracinda – significantly beyond what the cost of trial preparation would have been had the documents been produced in a timely fashion. *See Scarborough v. Eubanks*, 747 F.2d 871, 876 (3d Cir. 1984) (noting that prejudice includes "excessive and possibly irremediable burdens or costs imposed on the opposing party"). Although Valade's notes surfaced before he testified at trial, and Schrempp and Stallkamp were recalled for further testimony in light of the newly discovered evidence, Tracinda still suffered a degree of irremediable prejudice. *Flaherty* and *Williams* are therefore distinguishable from the instant case as the prejudice caused by the misconduct in those cases was substantially curable and therefore largely insignificant.

We conclude, therefore, in light of the circumstances of this case, that the District Court did not abuse its discretion in awarding Tracinda expense sanctions under Rule 16(f). DaimlerChrysler was wholly responsible for the late document production that caused Tracinda to incur substantial expenses. Despite the efforts of DaimlerChrysler and the District Court, the late production of Valade's notes irremediably prejudiced Tracinda's case. Valade's notes, which were not produced until the eve of the last day of trial, were highly relevant and would

61

have had an impact on Tracinda's strategy and actions prior to that point, throughout discovery and during trial.

DaimlerChrysler argues to the contrary that our holding will open the door to a "flood of satellite litigation" over Rule 16(f) expenses every time a document production error is unearthed after the close of discovery, which can be a common occurrence in complex litigations. DaimlerChrysler points out that scheduling orders often require document production to be completed before depositions commence, at which time witnesses often identify relevant documents not previously produced.

We do not concur with this assessment of the results of our decision. Production errors discovered at the pre-trial stage of litigation will result in little, if any, expense or prejudice to the opposing party and therefore are not likely to warrant the imposition of sanctions under Rule 16(f). On the other hand, if a litigant knows that even inadvertent failure to produce relevant documents may result in a sanction when the existence of the documents is discovered during trial, the litigant may exercise more care in ensuring that all relevant documents are produced.

DaimlerChrysler also argues that our holding will have the effect of deterring future litigants from admitting and rectifying discovery errors. However, as DaimlerChrysler admits, the obligation on parties and counsel to come forward with relevant documents not produced during discovery is "absolute." Indeed, the failure to do so can result in penalties more severe than monetary sanctions, including dismissal of the case. We are not concerned about chilling conduct that is compulsory and required by law.

### 3. Reasonableness of Expense Award

Having concluded that it was within the District Court's

discretion to impose sanctions on DaimlerChrysler, we must now consider whether the amount of expenses awarded to Tracinda was reasonable. If a party or attorney violates a pretrial order, Rule 16(f) authorizes a district judge to "make such orders with regard thereto as are just," including orders requiring the noncompliant person "to pay the reasonable expenses incurred *because of* any noncompliance with this rule, including attorney's fees." FED. R. CIV. P. 16(f) (emphasis added). DaimlerChrysler argues that the District Court abused its discretion by awarding Tracinda $556,061 because, according to DaimlerChrysler, the evidence of expenses presented by Tracinda – an attorney declaration including a summary of individual hours worked and corresponding hourly rates – failed to justify that amount. DaimlerChrysler argues that the declaration failed to distinguish adequately which expenses were incurred "because of" DaimlerChrysler's discovery error, and which were not, because the declaration did not include a precise breakdown of specific tasks performed. Even though the District Court awarded only half of the expenses originally requested by Tracinda,[22] DaimlerChrysler argues that such a breakdown was required because the District Court had an obligation to parcel out the relevant and irrelevant expenses. DaimlerChrysler also argues that the declaration was insufficient to demonstrate reasonableness because it was not accompanied by actual time sheets or receipts.

With regard to what DaimlerChrysler calls the District Court's "aversion to parceling," we find no abuse of discretion. Tracinda's attorney's declaration explicitly sets forth only those

---

[22] As the District Court noted in its opinion awarding the fees, Tracinda modified its request, reducing it by one half, "in order to avert the need to litigate any question concerning the reasonableness of the fees and expenses it seeks." *Tracinda Corp.,* 2005 WL 927187, at *3.

expenses incurred "*in connection with* the late production of Mr. Valade's Notes" (emphasis added), and declared, "under penalty of perjury pursuant to 28 U.S.C. § 1746 [permitting unsworn declaration in lieu of sworn affidavit]," that "Tracinda and its counsel never would have had to incur these additional attorneys' fees and costs *but for* the Defendants['] late production of Mr. Valade's Notes" (emphasis added).  Because the declaration listed only expenses incurred "because of" DaimlerChrysler's late production, FED. R. CIV. P. 16(f), there was no need for the District Court to parcel out the relevant fees and costs from the irrelevant ones as only relevant ones were requested.

We also reject DaimlerChrysler's argument to the extent it challenges the causation link between the late production of Valade's notes and the expenses incurred by Tracinda as set forth in the attorney declaration.  DaimlerChrysler first produced Valade's notes during trial, on December 16, 2003.  The trial was supposed to end the *following day* but was forced into recess because of DaimlerChrysler's late production.  The litigation continued for several more weeks, through the Christmas and New Year's holidays, with trial finally coming to an end on February 11, 2004.  As stated in Tracinda's attorney declaration, throughout this period, Tracinda had to (1) prepare for and participate in the December 22, 2003, hearing before the Special Master, (2) prepare and file its objections to the Special Master's findings, (3) prepare and file its motion for sanctions, (4) review and analyze the newly produced Valade notes and alter its trial strategy accordingly, (5) prepare for and participate in the examination of Valade and re-examination of Schrempp and Stallkamp in light of the new evidence, and (6) prepare for and participate in three days of trial, including at least one day not originally planned for.  It is self-evident that the overwhelming majority of these tasks had to be performed directly because of DaimlerChrysler's late production.  Although it is true that some parts of these tasks had to have

64

been performed irrespective of DaimlerChrysler's error (e.g., Tracinda's examination of Valade on subjects not covered by the tardily produced notes), certainly significant attorney's fees and costs incurred by Tracinda during this time period were

directly caused by DaimlerChrysler's noncompliance with Rule 16.

Next, we address DaimlerChrysler's argument that Tracinda's attorney's declaration was insufficient to prove the reasonableness of the expenses awarded because the declaration did not attach actual time sheets and receipts for corroboration. Although "the preferred practice is for the attorney to attach contemporaneously recorded time sheets," we conclude that the declaration in this case is sufficient. *Yeager's Fuel, Inc. v. Penn. Power & Light Co.*, No. 91-CV-5176, 1992 WL 78827, at *4 (E.D. Pa. Apr. 10, 1992) (under Rule 37, sanctioning plaintiff for discovery abuses and awarding defendant reasonable expenses based on attorney's affidavit summarizing time spent by and billable rates of defense counsel) (citing *Webb v. County Bd. of Education*, 471 U.S. 234, 238 n.6 (1985) (reviewing attorney's affidavit in support of prevailing party's request for attorney's fees pursuant to 42 U.S.C. § 1988)).

The declaration supporting Tracinda's request for expenses was made by Alan Stone, a partner at a Wilmington law firm (Morris, Nichols, Arsht & Tunnel), one of three large firms representing Tracinda, the other two being located in New York (Fried, Frank, Harris, Shriver & Jacobson LLP) and Los Angeles (Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro LLP). With regard to attorney's fees, the declaration sets forth three tables, one for each firm, listing the names of the legal professionals who worked for Tracinda (including partners, associates, and support staff), their hourly rates (ranging from $690/hour to $100/hour), the number of hours they worked during the relevant 7-week time period (ranging

from 239 hours to less than 1 hour), and the total fees accrued (approximately $145,000 for 456 hours for the Wilmington firm, $264,000 for 683 hours for the New York firm, and $465,000 for 1,249 hours for the Los Angeles firm), which came to a grand total of approximately $874,000 for 2,388 hours of work. The declaration states, under penalty of perjury, that these "tables set forth the actual amount of hours worked by attorneys and support staff from Plaintiff's counsel in connection with the late production of Valade's Notes." With regard to other costs, the declaration sets forth three more tables listing miscellaneous expenses (e.g., travel, hotel, consulting, duplication, etc.) incurred by each firm as a result of DaimlerChrysler's late production, which totaled approximately $119,000.

DaimlerChrysler does not directly challenge the hourly rates or the total for miscellaneous costs set forth in the declaration. Rather, DaimlerChrysler focuses on the quantity of legal work summarized in the declaration (approximately 2400 hours) and contends that it exaggerates the actual legal fees incurred by Tracinda as a result of DaimlerChrysler's late production. DaimlerChrysler argues that it was abuse of discretion for the District Court not to require corroborating evidence, such as contemporaneously recorded time records.

We reject DaimlerChrysler's argument to the extent it accuses Alan Stone of issuing a false declaration. Stone's declaration was made "under penalty of perjury" and the District Court's made an implicit factual finding that Stone's declaration was credible. There is nothing in the record to cast doubt on the District Court's conclusion that it was reasonable for Tracinda's lawyers to spend 1200 hours of time collectively during a 7-week recess from trial (representing approximately 170 hours a week) in this remarkably complicated, high-stakes litigation. The District Judge presided over this massive case for over 4 years and was intimately familiar with its complexity, the lawyers involved, and the amount of work required to prosecute

it. Without any evidence of error, we will not second-guess the judgment of a District Judge well-positioned to determine the reasonableness of a fee request.

## III. **CONCLUSION**

For the foregoing reasons, we will **AFFIRM** the District Court's order of November 19, 2003, granting DaimlerChrysler's motion to strike Tracinda's jury demand and the judgment of April 7, 2005, finding DaimlerChrysler not liable for common law fraud or federal securities violations. Without reaching the merits, we will **DENY AS MOOT** Tracinda's appeal of the District Court's order of March 5, 2003, granting defendant Kopper's motion to dismiss for lack of personal jurisdiction. With regard to DaimlerChrysler's cross-appeal, we will **AFFIRM** the District Court's order of April 20, 2005, awarding Tracinda $556,061 in costs for DaimlerChrysler's late discovery production. Finally, we will **DENY AS MOOT** DaimlerChrysler's cross-appeal of the District Court's order of June 25, 2003, denying DaimlerChrysler's motion for summary judgment on statute of limitations grounds.

*Tracinda Corp. v. DaimlerChrysler AG*, Nos. 05-2363/05-2482

RENDELL, *Circuit Judge* - dissenting.

I respectfully dissent from that portion of the majority's opinion that affirms the award of costs and attorney's fees under Fed. R.Civ. P. 16(f) for DaimlerChrysler's accidental

67

noncompliance with the District Court's discovery order.[23]  In not one of the cases cited by the parties, or by the District Court, has a party been ordered to pay expenses under Rule 16(f) based on less than the party's *negligent* noncompliance.  *See Ayers v. City of Richmond,* 895 F.2d 1267, 1270 (9th Cir. 1990) (reviewing imposition of Rule 16(f) sanctions on attorney who received notice of hearing, but failed to appear because the date "slipped by him"); *Matter of Baker*, 744 F.2d 1438, 1441 (10th Cir. 1984) (noting that the "record reflects not contumaciousness, but a pattern of negligence"); *Reilly Foam Corp. v. Rubbermaid Corp*., 206 F. Supp. 2d 643, 660 (E.D. Pa. 2002) (imposing Rule 16 sanctions for plaintiff's "wilful violation of the Court's scheduling order"); *Martin Family Trust v. Heco/Nostalgia Enters. Co*., 186 F.R.D. 601, 603 (E.D. Cal. 1999) (imposing Rule 16(f) sanctions for plaintiff's unexplained failure to file a status report as required no later than 14 days prior to a specific scheduling conference); *Santos v. U.S. Dep't of Hous. & Urban Dev*., Nos. 89-2892, 89-2979 & 89-4824, 1992 WL 165677, at *10 (E.D. Pa. July 2, 1992) (reviewing sanctions imposed by bankruptcy court for counsel's failure to assist in the preparation of a joint pretrial statement as ordered by that court and noting that "[w]ith adequate notice and opportunity for a hearing, the bankruptcy court may impose a punitive sanction for even negligent noncompliance with Rule 16").  To do so here is, I suggest, unprecedented and unjust.

Here, a Special Master conducted an evidentiary hearing concerning the noncompliance with the discovery order and, based on the record developed at the hearing, determined that the "DaimlerChrysler attorneys did not intentionally or in bad faith withhold relevant documents from production." Supp.

---

[23]I do not disagree with the majority's rulings with respect to the rest of the District Court's orders.

Appx. 6173.  The Special Master found that the most likely explanation for the late production was the careless copying of the documents in question by outside copy vendors.  *Id.*  No blame was leveled at DaimlerChrysler by the Special Master, or by anyone else, for that matter.

I have found no authority that supports holding DaimlerChrysler strictly liable under Rule 16(f) for its accidental noncompliance with a court order.  While it is regrettable that the copy vendors' errors were not discovered earlier, it is not "just" within the meaning of Rule 16(f) to punish DaimlerChrysler merely because something went wrong.  Only in extreme situations do we penalize without regard to fault and Rule 16 does not allow for the imposition of such a penalty here.

Moreover, the $556,061 penalty assessed was imposed without adequate foundation.  The attorney billing records submitted by Tracinda included only the number of hours expended per attorney and each attorney's billing rate, but did not give a detailed breakdown of what tasks each attorney performed.  District Court avoided making a determination as to which hours of work were expended for what purpose by assuming that a 50% reduction in the total amount of claimed attorney's fees resulted in a "reasonable" sum.  Appx. 7782.  This only adds to my discontent regarding the award.  I therefore would have vacated the award rather than approve of such an unwarranted and unsupported sanction.

69