PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 09-2515

CYBERWORLD ENTERPRISE
TECHNOLOGIES, INC.
d/b/a Tekstrom, Inc.

v.

JANET NAPOLITANO,
Secretary of the Department of Homeland Security;
ATTORNEY GENERAL ERIC H. HOLDER, JR.;
HILDA L. SOLIS,
Secretary of the Department of Labor;
MICHAEL AYTES,
Acting Deputy Director, United States
Citizenship and Immigration Services

Cyberworld Enterprise Technologies, Inc.,
                                    Appellant

Appeal from the United States District Court
for the District of Delaware
(D.C. Civil No. 1-06-cv-00402)
District Judge: Honorable Joseph J. Farnan, Jr.

Argued January 11, 2010

Before: RENDELL, AMBRO and CHAGARES,
<u>Circuit</u> <u>Judges</u>.

(Filed: April 12, 2010)

───────────

H. Ronald Klasko, Esq.    **[ARGUED]**
Klasko, Rulon, Stock & Seltzer
1800 John F. Kennedy Boulevard
Suite 1700
Philadelphia, PA 19103

Stephen J. Neuberger, Esq.
The Neuberger Firm
2 East 7th Street, Suite 302
Wilmington, DE 19801
   *Counsel for Appellant*

Seth M. Beausang, Esq.
Office of United States Attorney
1007 North Orange Street, Suite 700
P.O. Box 2046
Wilmington, DE 19899

Joan Brenner, Esq.    **[ARGUED]**

Paul L. Frieden, Esq.
United States Department of Labor
Office of the Solicitor
Room N2716
200 Constitution Avenue, N.W.
Washington, DC 20210
   *Counsel for Appellees*

OPINION OF THE COURT

RENDELL, Circuit Judge.

In this appeal, we consider whether the Secretary of Labor retained jurisdiction to impose sanctions for violations of H-1B visa regulations when she failed to act until eighteen months after the time period prescribed by statute for her actions had expired. We conclude that, under the analysis prescribed by the Supreme Court in *Brock v. Pierce County*, 476 U.S. 253 (1986), the Secretary had jurisdiction to act after the deadline passed.

Cyberworld Enterprise Technologies is a temporary staffing company that obtains H-1B visas for its employees and then places the employees with other companies, known as "secondary employers." Under federal law, Cyberworld is required to inquire of the secondary employer whether the hiring of an H-1B employee will cause a "United States worker" to be laid off, or "displaced." On August 9, 2001, the Department of Labor received a complaint that Cyberworld had failed to

3

comply with this requirement. Although the Department was required by law to determine within thirty days whether a "reasonable basis" existed for the complaint, it did not make this determination until March 20, 2003, when it found that Cyberworld had failed to make the required inquiries on fourteen occasions. As provided for by statute, the Secretary of Labor assessed a $3400 penalty and notified the Attorney General to deny Cyberworld's H-1B applications for the ensuing year.

After unsuccessfully challenging these sanctions through an administrative appeal, Cyberworld brought an action in federal district court against the Secretary and other officials under the Administrative Procedure Act ("APA"), contending that the Secretary was without jurisdiction to impose sanctions because she had failed to act before the thirty-day deadline. Cyberworld also contended that the Secretary's action was untimely under the doctrine of laches, that sanctions were improper because Cyberworld had not knowingly violated the statute, that the sanctions imposed were not authorized by Department of Labor regulations, and that the Secretary should have exercised her discretion not to impose sanctions. The District Court granted summary judgment to the Government defendants. Like the District Court, we are not persuaded by Cyberworld's arguments, and will affirm the District Court's order granting summary judgment.

I.

A.

The H-1B visa program is designed to allow professionals from other countries who are employed in "specialty occupations" to work in the United States on a temporary basis. 20 C.F.R. § 655.700. Employers obtain H-1B visas for their employees by filing certain applications with the Department of Labor and the Department of Homeland Security. *See id.* H-1B employees either work directly for the employer who obtained the visa or are placed with other employers in need of specialty labor. As a temporary staffing agency, Cyberworld places its H-1B employees with other employers and is therefore known as a "placing employer." Since the bulk of Cyberworld's workforce consists of H-1B employees, it is also known as an "H-1B-dependent employer."

In order to obtain H-1B visas for their employees, employers must file a "labor condition application" ("LCA") with the Department of Labor under procedures set forth by 8 U.S.C. § 1182(n), which was incorporated into the Immigration and Nationality Act ("INA") by the Immigration Act of 1990 (the "1990 Act") and later amended by the American Competitiveness and Workforce Improvement Act of 1998 ("ACWIA"). *See* Pub. L. No. 101-649 § 205, 104 Stat. 4978, 5021-22 (1990); Pub. L. No. 105-277 §§ 412-13, 112 Stat. 2681, 2981-642 to -650 (1998). As part of this application, an employer must make several attestations required by § 1182(n)(1), including that the employer will pay H-1B employees no less than the prevailing wage for that type of job;

that the employer's current employees are not on strike; that the employer has notified its employees of its intent to hire H-1B workers; and that the employer has attempted to recruit employees in the United States to fill its positions.

The attestation requirement relevant here was enacted by the ACWIA, and requires that placing employers attest in the LCA that they have confirmed with secondary employers that the hiring of an H-1B employee will not displace a "United States worker" employed by the secondary employer. Specifically, 8 U.S.C. § 1182(n)(1)(F) provides that the LCA must state that:

> *the employer will not place the nonimmigrant with another employer* (regardless of whether or not such other employer is an H-1B-dependent employer) where—
>
> > (i) the nonimmigrant performs duties in whole or in part at one or more worksites owned, operated, or controlled by such other employer; and
> >
> > (ii) there are indicia of an employment

6

> relationship between
> the nonimmigrant
> and such other
> employer;
>
> *unless the employer has inquired of the other employer as to whether, and has no knowledge that,* within the period beginning 90 days before and ending 90 days after the date of the placement of the nonimmigrant with the other employer, *the other employer has displaced or intends to displace a United States worker employed by the other employer.*

§ 1182(n)(1)(F) (emphases added).[1]

The inquiry requirement is also contained in Department

---

[1] "[T]he employer is considered to 'displace' a United States worker from a job if the employer lays off the worker from a job that is essentially the equivalent of the job for which the nonimmigrant or nonimmigrants is or are sought." 8 U.S.C. § 1182(n)(4)(B). "The term 'United States worker' means an employee who—(i) is a citizen or national of the United States; or (ii) is an alien who is lawfully admitted for permanent residence, is admitted as a refugee under section 1157 of this title, is granted asylum under section 1158 of this title, or is an immigrant otherwise authorized, by this chapter or by the Attorney General, to be employed." § 1182(n)(4)(E).

of Labor regulations:

> The H-1B employer is *prohibited from placing the H-1B nonimmigrant with another employer*, *unless the H-1B employer has inquired* of the other/secondary employer as to whether, *and has no knowledge that*, within the period beginning 90 days before and ending 90 days after the date of such placement, *the other/secondary employer has displaced or intends to displace a similarly-employed U.S. worker* employed by such other/secondary employer.

20 C.F.R. § 655.738(d)(5) (emphases added). The regulations then set forth "standards and guidance" that apply to the inquiry obligation. *Id.*

The Secretary is required to certify an LCA within seven days unless she "finds that the application is incomplete or obviously inaccurate." § 1182(n)(1). Thus, she is not generally permitted to investigate the veracity of the employer's attestations on the LCA prior to certification. However, she is required to investigate *complaints* regarding an employer's "failure to meet a condition" of § 1182(n)(1) or "misrepresentation of material facts" in an LCA. § 1182(n)(2)(A). Such complaints "may be filed by any

8

aggrieved person or organization," and must be "filed not later than 12 months after the date of the failure or misrepresentation." *Id.*

The statute mandates that "the Secretary *shall* provide, *within 30 days* after the date such a complaint is filed, for a *determination as to whether or not a reasonable basis exists* to make a finding described in subparagraph (C)." § 1182(n)(2)(B) (emphases added).[2]  As relevant here, subparagraph (C) refers to "a failure to meet a condition of paragraph . . . (1)(F)," which sets out the inquiry obligation described above.

[2] Section 1182(n)(2)(B) continues as follows:

> If the Secretary determines that such a reasonable basis exists, the Secretary shall provide for notice of such determination to the interested parties and an opportunity for a hearing on the complaint, in accordance with section 556 of Title 5, within 60 days after the date of the determination.  If such a hearing is requested, the Secretary shall make a finding concerning the matter by not later than 60 days after the date of the hearing.  In the case of similar complaints respecting the same applicant, the Secretary may consolidate the hearings under this subparagraph on such complaints.

9

§ 1182(n)(2)(C)(i).

Department regulations delegate the "reasonable basis" determination to the Administrator of the Wage and Hour Division (the "Administrator"), *see* 20 C.F.R. § 655.815, and impose a thirty-day deadline for the Administrator to issue this determination.

> If the Administrator determines that an *investigation* on a complaint is warranted, the complaint shall be accepted for filing; an investigation *shall be conducted and a determination issued within 30 calendar days of the date of filing*. The time for the investigation may be increased with the consent of the employer and the complainant, or if, for reasons outside of the control of the Administrator, the Administrator needs additional time to obtain information needed from the employer or other sources to determine whether a violation has occurred. No hearing or appeal pursuant to this subpart shall be available regarding the Administrator's determination that an investigation on a complaint is warranted.

10

20 C.F.R. § 655.806(a)(3) (emphases added).

If the Department ultimately determines that the inquiry requirement was violated, the statute provides for monetary penalties and a suspension of future approvals of H-1B applications:

> If the Secretary finds, after notice and opportunity for a hearing, *a failure to meet a condition of paragraph* (1)(B), (1)(E), or *(1)(F)*, a substantial failure to meet a condition of paragraph (1)(C), (1)(D), or (1)(G)(i)(I), or a misrepresentation of material fact in an application—
>
> > (I)   the Secretary shall notify the Attorney General of such finding and may, in addition, impose such other administrative remedies (including civil monetary penalties in an amount not to exceed $1,000 per violation) as the Secretary determines to be

11

> appropriate; and
>
> > (II)    *the Attorney General shall not approve petitions* filed with respect to that employer under section 1154 or 1184(c) of this title *during a period of at least 1 year* for aliens to be employed by the employer.

§ 1182(n)(2)(C)(i) (emphases added).  The one-year suspension required by § 1182(n)(2)(C)(i)(II) is known as "debarment."[3]

The Department's regulations provide for the same sanctions:

> > (b)    Civil money penalties.  The Administrator may assess civil money penalties for violations as follows:

---

[3] Although § 1182 refers to the Attorney General as having debarment authority, this function was subsequently transferred by 6 U.S.C. § 271(b) from the Attorney General to U.S. Citizenship and Immigration Services, a component of the Department of Homeland Security.

(1)     An amount not to exceed $1,000 per violation for:

       (i)     A violation pertaining to strike/lockout (§ 655.733) or *displacement of U.S. workers (§ 655.738)*;

       . . . .

(d)     Disqualification from approval of petitions. *The Administrator shall notify the [Department of Homeland Security]* pursuant to § 655.855 *that the employer shall be disqualified from approval of any petitions* filed by, or on behalf of, the employer pursuant to section 204 or section 214(c) of the INA for the following periods:

       (1)     *At least one year* for violation(s) of any of

13

the provisions specified in paragraph (b)(1)(i) through (iii) of this section;

. . . .

20 C.F.R. § 655.810 (emphases added).

## B.

On August 9, 2001, the Department's Wage and Hour Division received a complaint regarding Cyberworld's compliance with § 1182(n). The Division then investigated the complaint, and on March 20, 2003, over nineteen months after receiving the complaint, the Administrator issued his reasonable basis determination, finding that Cyberworld had "failed to make the required displacement inquiry of the secondary employer." App. 129. The Administrator assessed a $3400 penalty and determined that the Attorney General would be notified of the violation so that he could impose a one-year debarment.[4]

Cyberworld filed an administrative appeal. The company conceded that it had failed to make the required displacement inquiry with respect to each of the fourteen LCAs that it

---

[4] At oral argument, counsel for Cyberworld stated that the one-year period of debarment will not begin until the conclusion of this appeal.

14

submitted between January 19, 2001, and October 1, 2002. It also stipulated that the fourteen H-1B workers whom it placed with secondary employers during this period "perform[ed] duties" for the other employers and that there were "indicia of an employment relationship" between the H-1B workers and the other employers, thus satisfying the other elements of a § 1182(n)(1)(F) violation. However, Cyberworld challenged the Secretary's jurisdiction to act after the thirty-day deadline, as well as her authority to impose sanctions without proof of scienter. An Administrative Law Judge ("ALJ") rejected these arguments and affirmed the determination that Cyberworld was subject to sanctions. Cyberworld then appealed to the Department of Labor's Administrative Review Board, which summarily affirmed on the grounds provided by the ALJ. Cyberworld then filed a complaint under the APA in federal district court, seeking declaratory and injunctive relief.

The Government defendants moved for summary judgment, and the District Court granted the motion. Relying on the Supreme Court's decision in *Pierce County*, the District Court held that the language in § 1182(n)(2)(B) providing that "the Secretary shall" make a determination within thirty days does not deprive the Secretary of jurisdiction to issue such a determination after the thirty days have expired. The District Court also rejected Cyberworld's argument that the Secretary's action was foreclosed by the doctrine of laches, since Cyberworld had failed to show that it was prejudiced by the Secretary's delay. Finally, the Court concluded that the Secretary was not required to show any knowledge on the part of Cyberworld, and that the Secretary had correctly determined that the one-year debarment was required by law.

15

II.

The District Court had jurisdiction over this case under 28 U.S.C. § 1331 and the APA, 5 U.S.C. §§ 702 and 706.  We have jurisdiction under 28 U.S.C. § 1291.

When reviewing a grant of summary judgment in a case brought under the APA, we apply *de novo* review to the district court's ruling, and in turn apply the applicable standard of review to the underlying agency decision.  *Concerned Citizens Alliance, Inc. v. Slater*, 176 F.3d 686, 693 (3d Cir. 1999).  An agency decision based on an issue of law that does not "implicate[] agency expertise in a meaningful way," like the Secretary's decision in this case, is subject to *de novo* review.  *Sandoval v. Reno*, 166 F.3d 225, 239-40 (3d Cir. 1999).

III.

Cyberworld's principal argument is that because § 1182(n)(2)(B) states that the Secretary "shall" make a determination within thirty days, and the word "shall" has a mandatory meaning, the Secretary lost jurisdiction to take action against it by failing to issue a reasonable basis determination within thirty days of receiving the complaint against Cyberworld.

This argument is foreclosed by the Supreme Court's decision in *Brock v. Pierce County*.  In *Pierce County*, the Court considered a deadline imposed on the Secretary of Labor by another statute, the Comprehensive Employment and Training Act ("CETA"), which authorized the Secretary to issue grants

16

for job training and employment.  476 U.S. at 255.  The CETA also authorized the Secretary to investigate complaints that CETA funds were being misused, but "require[d] that the Secretary 'shall' determine 'the truth of the allegation or belief involved, not later than 120 days after receiving the complaint.'" *Id.* at 255-56 (quoting 29 U.S.C. § 816(b) (Supp. V 1976) (repealed 1982)).  The Secretary issued this determination with respect to Pierce County nearly thirty months after receiving a complaint, and thus failed to meet the 120-day deadline.  *Id.* at 256-57.  The Court of Appeals for the Ninth Circuit held that the 120-day limit was "jurisdictional," and determined that the Secretary thus lost his power to issue a determination after the expiration of the 120 days.  *Id.* at 257-59.

The Supreme Court reversed, concluding that "the mere use of the word 'shall' . . . , standing alone, is not enough to remove the Secretary's power to act after" the deadline.  *Id.* at 262.  The Court noted that it was "most reluctant to conclude that every failure of an agency to observe a procedural requirement voids subsequent agency action, especially when important public rights are at stake."  *Id.* at 260.  It therefore studied the language and legislative history of the CETA "to determine whether Congress did indeed desire [the] somewhat incongruous result" of depriving the Secretary of his authority after the expiration of this deadline, and adopted a line of precedent holding that a statutory time limit does not divest an agency of jurisdiction unless the statute "specifies a consequence for failure to comply with the provision."  *Id.* at 258, 259-60 (internal quotation marks and citations omitted).  After reviewing the CETA's language and legislative history, the Court found that there was nothing "to suggest that Congress

17

intended to impose a jurisdictional limitation on agency action." *Id.* at 262-63.

The Court also discussed and rejected several opposing arguments. First, it distinguished *Pierce County* from an earlier case, *Mohasco Corp. v. Silver*, 447 U.S. 807 (1980), in which the Court had "held that an action filed by a private plaintiff after the expiration of the 300-day time period provided in [the Civil Rights Act of 1964] was jurisdictionally barred." 476 U.S. at 261. The Court noted that while "legislatures routinely create statutes of limitations for the filing of complaints" with jurisdictional effects, "[t]here [was] less reason . . . to believe that Congress intended such drastic consequences to follow from the Secretary's failure to meet the 120-day deadline," because the CETA "requires him to resolve the entire dispute within that time." *Id.* This "is a more substantial task than filing a complaint, and . . . is subject to factors beyond [the Secretary's] control." *Id.* Moreover, unlike in *Mohasco*, which involved a private right of action, "public rights are at stake, and the Secretary's delay . . . would prejudice the rights of the taxpaying public." *Id.*

Second, the Court rejected the argument that agencies should be permitted to act after the expiration of a deadline "only when agency inaction would prejudice a private citizen seeking some sort of redress." *Id.* at 261-62. The Court noted that "the protection of the public fisc is a matter that is of interest to every citizen, and we have no evidence that Congress wanted to permit the Secretary's inaction to harm that interest." *Id.* at 262.

18

Third, the Court rejected the argument that the Secretary had also lost jurisdiction by failing to comply with administrative regulations establishing a deadline. As with the statutory deadline, the Court noted that the regulations "do not specify any consequences of a failure to meet that deadline." *Id.* at 265.

The Supreme Court has since summarized the holding of *Pierce County* as follows: "[I]f a statute does not specify a consequence for noncompliance with statutory timing provisions, the federal courts will not in the ordinary course impose their own coercive sanction." *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 63 (1993). Thus, "a statute directing official action needs more than a mandatory 'shall' before the grant of power can sensibly be read to expire when the job is supposed to be done," and we will not construe "a provision that the Government 'shall' act within a specified time, without more, as a jurisdictional limit precluding action later." *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 161, 158 (2003).

Cyberworld attempts to distinguish this case from *Pierce County* on three grounds.

First, according to Cyberworld, *Pierce County* applies only when an agency is required to complete a "substantial task" by the statutory deadline. Cyberworld notes that under the CETA the Secretary was required to "resolve the entire dispute" within the statutory time period, 476 U.S. at 261, but that under § 1182(n) she is only required to make "a determination as to whether or not a reasonable basis exists" for finding a violation,

19

§ 1182(n)(2)(B). However, *Pierce County* never limited its holding to cases where an agency must complete a "substantial task." Rather, it used that language to explain why a deadline for administrative action is not comparable to a statute of limitations in private litigation, which the Court had held in *Mohasco* to be jurisdictional. In any event, similar to the actions required by the CETA, the Administrator under § 1182(n) issues a determination only after an investigation, must explain his reasoning in the determination, and must prescribe remedies for any violation that he finds. 20 C.F.R. §§ 655.806(a)(3), 655.815(c). Thus, even assuming *arguendo* that the nature of the task is a relevant consideration, the "task" here is not insubstantial.

Second, Cyberworld contends that *Pierce County* applies only when an agency is acting to protect a "public right" or the "public fisc." In *Pierce County*, the Court noted that it was especially reluctant to impose jurisdictional limitations on an agency trying to protect public rights and the public fisc, 476 U.S. at 260, and explained that this was one reason why *Mohasco* was distinguishable from actions under the CETA, *id.* at 261. Here, like in *Pierce County*, the "rights" that the Secretary seeks to vindicate are of a "public" nature, since she is acting to protect the U.S. workforce from displacement by H-1B recipients and to enforce the rules of the immigration system.

Third, Cyberworld contends that even if the *statutory* deadline did not foreclose the Secretary's actions, the *regulatory* deadline imposed by 20 C.F.R. § 655.806(a)(3) would bar her actions. Under *Pierce County*, we evaluate regulatory deadlines

20

in the same manner as statutory deadlines, by determining whether a regulation "specif[ies] any consequences of a failure to meet [its] deadline." 476 U.S. at 265. Nothing in § 655.806 indicates that any consequence results from a failure to issue a determination within thirty days. As the Court of Appeals for the Seventh Circuit has held, "absent a clear indication to the contrary, regulatory deadlines, like statutory deadlines, provide no remedy for their own violation." *Hendrickson v. FDIC*, 113 F.3d 98, 101 (7th Cir. 1997).

*Pierce County* thus controls here, and requires that we analyze the "express language" of the statute, as well as its "structure, purpose, and legislative history," to determine whether Congress intended to remove the Secretary's authority to act after the thirty-day deadline. *Barnhart*, 537 U.S. at 161, 163. We find nothing in the language, structure, purpose, or legislative history of § 1182(n) to support Cyberworld's claim that Congress had this intent.

The only relevant piece of statutory language cited by Cyberworld is the word "shall." Cyberworld correctly argues that "shall" usually has a mandatory meaning. However, by virtue of *Pierce County*, we cannot rely on the word "shall" alone to conclude that Congress intended for the Secretary to lose her power to act. This is especially true given that § 1182(n) was enacted several years after *Pierce County*, once "Congress was presumably aware that [courts] do not readily infer congressional intent to limit an agency's power to get a mandatory job done merely from a specification to act by a certain time." *Barnhart*, 537 U.S. at 160. Nothing else in the statute's language indicates that Congress intended to limit the

21

Secretary's power after the expiration of thirty days, or to impose any other consequence for her failure to meet the deadline.

Cyberworld also points to the other instances of the word "shall" in § 1182(n)(2)(B), and argues that if we allow the Secretary to exercise jurisdiction after the statutory deadline has passed, we must construe the other instances of "shall" in a similarly permissive manner. If "shall" is not mandatory, it argues, then the Secretary would not be *required* to give notice of her "determination to the interested parties and an opportunity for a hearing," or to "make a finding" after the hearing. § 1182(n)(2)(B). This argument overstates the impact of *Pierce County*. *Pierce County* does not deprive the word "shall" of its mandatory force. The Secretary is still required by § 1182(n)(2)(B) to make a reasonable basis determination, to give notice of that determination to interested parties, to hold a hearing if requested, and then to make a further determination after the hearing. *Pierce County* does, however, prevent us from reading the word "shall" so expansively as to mean that the Secretary was forbidden from imposing sanctions because she failed to comply with the statute's "procedural requirement" that she act within thirty days. 476 U.S. at 260, 258.

Cyberworld also cites a statement in the legislative history of the 1990 Act that "the Secretary of Labor *is to* investigate and determine within thirty days if there is reasonable cause" for finding a violation, H.R. Rep. No. 101-723 pt.1, at 65 (1990) (emphasis added), and argues that the phrase "is to" demonstrates that Congress intended for the word "shall" to have a mandatory meaning. Even without relying on

22

this legislative history, we agree that the word "shall" has a mandatory meaning.  As in *Pierce County*, however, this legislative history does not "suggest that Congress intended to impose a jurisdictional limitation on agency action" occurring after the thirty-day period.  476 U.S. at 262-63.

Indeed, the legislative history and purpose of § 1182(n) offer no support for Cyberworld's position.  A report of the House Committee on the Judiciary regarding the 1990 Act, which first implemented the complaint-driven process and thirty-day timetable that are still in place today, demonstrates that Congress was concerned with remedying the prior H-1B system, which had "neither serve[d] business needs nor protect[ed] the domestic labor force," in part because of lengthy processing delays in issuing the visas.  H.R. Rep. No. 101-723 pt. 1, at 61 (1990).  Although the Committee report refers to the thirty-day deadline, it does not explain why the reasonable basis determination must be issued so quickly.  *Id.* at 65-66.  When the ACWIA later added several provisions regarding the displacement of U.S. workers, including the inquiry requirement at issue here, Congress emphasized its goal of "ensur[ing] that companies will not replace American workers with foreign born professionals," such as by "replacing a particular laid-off U.S. worker with a particular covered H-1B" worker.  144 Cong. Rec. S12741, S12749-50 (Oct. 21, 1998) (statement of Sen. Abraham).  Again, however, the legislative history is silent as to the reasons for applying the thirty-day deadline to reasonable basis determinations regarding the inquiry requirement.  *Id.* at S12752.

Thus, while the 1990 Act made the investigative process

23

complaint-driven and imposed deadlines to eliminate unnecessary bureaucratic processing, the deadline was certainly not a goal of the statute. The same is true of the ACWIA's application of this deadline to investigations of the inquiry requirement. To the contrary, a primary goal of the 1990 Act and the ACWIA was to prevent displacement of the American workforce. Although Congress was cognizant of the impact of government procedures on employers and workers, we can find no evidence that it intended to make the interests of H-1B employers paramount to the enforcement of regulations designed to prevent displacement. This is especially true given the federal government's strong interest, which is not even shared with the states, in regulating immigration. If the federal government were prevented from acting after the thirty-day deadline, the statute's displacement requirements would be left essentially unregulated. We see no indication that Congress intended such a drastic result.

We agree with Cyberworld that nineteen months is a long period of time for an agency to take before acting when the governing statute specifies that the agency "shall" act within thirty days. Nonetheless, since Congress did not prevent the Secretary from acting after the deadline had expired, *Pierce County* dictates the conclusion that the Secretary had jurisdiction to act when she did.

IV.

Cyberworld also argues that the doctrine of laches bars the imposition of sanctions because of the Secretary's nineteen-month delay in issuing the determination, that it was entitled to

24

discovery to establish facts supporting its laches argument, and that summary judgment on the issue of laches was premature in the absence of such discovery. We find these arguments unpersuasive.

The doctrine of laches bars an action only when the delay in bringing the action both caused prejudice and was inexcusable. *Tracinda Corp. v. DaimlerChrysler AG*, 502 F.3d 212, 226 (3d Cir. 2007). We review a district court's determination regarding laches for abuse of discretion. *Id.* We also review a district court's discovery orders for abuse of discretion, and will not disturb such orders without a showing of actual and substantial prejudice. *Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n*, 107 F.3d 1026, 1032 (3d Cir. 1997); *Hewlett v. Davis*, 844 F.2d 109, 113 (3d Cir. 1988).

Cyberworld urges that it experienced two types of prejudice resulting from the Secretary's delay: the harm inherent in being required "to operate in a state of uncertainty for an unduly lengthy period of time," and the possibility that its employees and other witnesses would remember events less clearly because of the passage of time. Appellant's Br. at 38. Both are speculative and lack any support in the record. Cyberworld has offered no evidence to substantiate its claim that it was harmed by either of these potential forms of prejudice, and in light of Cyberworld's concession in the administrative proceedings that it violated the inquiry requirement on fourteen occasions, we are skeptical that any such evidence could have been produced. Moreover, we do not understand how discovery would have been of use to Cyberworld. If it wished to introduce evidence that it had been harmed by "operat[ing] in a state of

25

uncertainty," it could have done so by producing its own business records. It could also have guarded against any memory loss by having its employees record their knowledge in affidavits. Since Cyberworld has not shown prejudice from the Secretary's delay, there was no genuine issue of fact to preclude the entry of summary judgment regarding the issue of laches.[5]

Nonetheless, Cyberworld contends that it was entitled to discovery from the Government regarding the reasons for the Secretary's delay, ostensibly to show that the delay was "inexcusable." Even if Cyberworld had been able to make such a showing, however, discovery would not have enabled it to show prejudice, and its laches claim would still have failed. Thus, Cyberworld has not demonstrated that discovery would have allowed it to "present facts essential to justify its opposition." Fed. R. Civ. P. 56(f). We therefore find no abuse of discretion in the District Court's denial of further discovery.[6]

[5] Cyberworld invokes our decision in *Lehigh Valley Manpower Program v. Donovan*, 718 F.2d 99 (3d Cir. 1983), to argue that "prejudice is not a requirement for a time limit to be enforced." Not only did *Lehigh Valley* not address the elements of laches, but we have previously recognized that it was overruled by the Supreme Court in *Pierce County*. *See City of Camden v. U.S. Dep't of Labor*, 831 F.2d 449, 451 (3d Cir. 1987).

[6] Cyberworld also contends that evidence produced in discovery could have bolstered its argument that the Secretary did not comply with the thirty-day deadline in 20 C.F.R. § 655.806(a)(3), since that regulation allows extensions to the

V.

Cyberworld contends that sanctions can only be imposed under § 1182(n)(2)(C)(i) if there is scienter—that is, if the failure to inquire was knowing or intentional—and that it was therefore improperly sanctioned because it lacked such knowledge. However, § 1182(n)(2)(C)(i) contains no such requirement, and we see no basis for finding that Congress intended to include one in the statute.

Cyberworld was sanctioned under § 1182(n)(2)(C)(i), which provides for sanctions for "a failure to meet a condition of paragraph . . . (1)(F)." Paragraph (1)(F), in turn, provides that employers will not place H-1B visa recipients with another employer "unless the employer has inquired of the other employer as to whether, and has no knowledge that . . . , the other employer has displaced or intends to displace a United States worker employed by the other employer." § 1182(n)(1)(F). Thus, an employer can effectuate a placement only if *both* conditions are met. Conversely, sanctions must be imposed under paragraph (2)(C)(i) for a violation of paragraph (1)(F) either if the placing employer fails to inquire of the secondary employer about displacement or if, even though the placing employer did make the inquiry, it had knowledge (including independently) that the secondary employer "has

_____

deadline only when the delay is caused by reasons "outside of the control of the Administrator." In light of our holding that the Secretary's failure to comply with this deadline did not divest her of jurisdiction, however, such discovery could not have helped Cyberworld's case.

27

displaced or intends to displace a United States worker." Since Cyberworld concedes that it did not inquire about displacement, it clearly failed to fulfill one of the two conditions. Here, the Secretary sanctioned the placing employer for failing to make the displacement inquiry (rather than for knowing that displacement would occur); the statute only required her to show that the inquiry was not made. She need not have determined whether there was an actual displacement, or whether the placing employer had any knowledge (independent or otherwise) regarding displacement.

Cyberworld urges a different reading. Cyberworld argues that since Congress included a scienter requirement in a different section, namely § 1182(n)(2)(E)(i), which provides for sanctions when a secondary employer "has displaced . . . a United States worker" *and* the "placing employer . . . *knew or had reason to know of such displacement*" (emphases added), Congress must have also intended scienter to be required in § 1182(n)(2)(C)(i). However, the presence of this language in a paragraph different from the paragraph under which Cyberworld was sanctioned actually undermines Cyberworld's position, since it demonstrates that Congress knew how to impose a scienter requirement when it wanted to do so. Indeed, by including a scienter requirement in paragraph (n)(2)(E)(i), which applies in instances of actual displacement rather than failures to inquire about displacement, Congress protected an entity like Cyberworld from being sanctioned for displacement resulting from the actions of third parties without its knowledge. By contrast, Cyberworld is being sanctioned for failing to take an action that was entirely within its control.

28

Cyberworld also contends that compliance with the inquiry requirement does not serve the statute's goal of preventing displacement because secondary employers can still place Cyberworld employees with "tertiary employers" without Cyberworld's knowledge, even if an inquiry is made. Thus, tertiary placements could still result in displacement, and this displacement would not be prevented by Cyberworld's inquiry of the secondary employer. Although Cyberworld may be correct that the statutory scheme will not always prevent displacement, that possibility does not justify our rewriting § 1182(n) so as to eliminate either the inquiry requirement or the Secretary's authority to sanction violations of the requirement.

VI.

As a sanction for violating the inquiry requirement, the Secretary notified the Attorney General that Cyberworld was disqualified from submitting H-1B petitions for a period of one year, which is commonly known as "debarment." Cyberworld argues that Department of Labor regulations do not authorize debarment for failures to inquire about displacement. This argument has two prongs. First, Cyberworld contends that the regulations that address debarment, 20 C.F.R. § 655.810(b) and (d), apply only to instances of actual displacement, not to failures to inquire about displacement. Second, Cyberworld contends that 20 C.F.R. §§ 655.855(a) and (c), which were cited by the Administrator's determination, do not authorize the sanctions imposed and therefore could not be invoked to sanction Cyberworld.

As an initial matter, the Secretary is directly authorized

29

by § 1182(n) itself to sanction violations of the inquiry requirement. Debarment is not only permitted, it is specifically *required* by § 1182(n)(2)(C)(i), which states that when the Secretary finds that an H-1B employer failed to satisfy the inquiry requirement "the Secretary shall notify the Attorney General of such finding" and "the Attorney General shall not approve [H-1B] petitions filed with respect to that employer . . . during a period of at least 1 year." This alone gave the Secretary the authority to sanction Cyberworld.

Contrary to Cyberworld's contention, debarment is also required by 20 C.F.R. § 655.810(b) and (d). Section 655.810(d) requires debarment for violations "specified in paragraph (b)(1)(i)." Section 655.810(b)(1)(i), in turn, refers to "violation[s] pertaining to . . . displacement of U.S. workers (§ 655.738)." Finally, § 655.738 describes all of the displacement-related violations, including, in § 655.738(d)(5), the failure to make displacement inquiries. Cyberworld contends that, because § 655.810(b)(1)(i) refers to "displacement of U.S. workers (§ 655.738)" without referring to "inquiries about displacement," it only authorizes sanctions when actual displacement has occurred. However, it is clear that § 655.810(b)(1)(i) refers to § 655.738 in its entirety, and uses the phrase "displacement of U.S. workers" only as a shorthand to refer to the numerous displacement-related violations described in that regulation. Thus, § 655.810(b)(1)(i) authorizes sanctions for failing to inquire about displacement, which is described in § 655.738(d)(5).[7]

_____

[7] Cyberworld also argues that because § 655.810(b) and (d) were not specifically cited in the Administrator's

30

Cyberworld is correct that § 655.855(a) and (c), despite being cited in the Administrator's determination, do not clearly authorize debarment. Section 655.855 provides as follows:

> (a) The Administrator shall notify the [Department of Homeland Security ("DHS")] and [Department of Labor Employment and Training Administration] of the final determination of any violation requiring that the DHS not approve petitions filed by an employer. The Administrator's notification will address the type of violation committed by the employer and the appropriate statutory period for disqualification of the

determination, Cyberworld should not have been sanctioned under those regulations. However, the determination did state that Cyberworld had "failed to make the required displacement inquiry of another employer . . . as required under 20 C.F.R. § 655.738." App. 132. As noted above, § 655.738 describes *all* displacement-related violations, and this statement was therefore sufficient to give Cyberworld notice of "the determination of the Administrator and the reason or reasons therefor," as required by 20 C.F.R. § 655.815(c)(1).

31

employer from approval of petitions. *Violations requiring notification to the DHS are identified in § 655.810(f).*

. . . .

(c)    The DHS, upon receipt of notification from the Administrator pursuant to paragraph (a) of this section, shall not approve petitions filed with respect to that employer under sections 204 or 214(c) of the INA (8 U.S.C. 1154 and 1184(c)) for nonimmigrants to be employed by the employer, *for the period of time provided by the Act and described in § 655.810(f).*

§ 655.855 (emphases added). Thus, these paragraphs require debarment only for "[v]iolations . . . identified in § 655.810(f)," and "for the period of time . . . described in § 655.810(f)." § 655.810(a), (c). Yet § 655.810(f) does not identify any violations or set forth any time periods; instead, it describes the procedure for paying monetary penalties assessed by the

32

Administrator.[8]   The reference to § 655.810(f) thus appears to

<hr />

[8] Section 655.810(f) provides as follows:

> The civil money penalties, back wages, and/or any other remedy(ies) determined by the Administrator to be appropriate are immediately due for payment or performance upon the assessment by the Administrator, or upon the decision by an administrative law judge where a hearing is timely requested, or upon the decision by the Secretary where review is granted.  The employer shall remit the amount of the civil money penalty by certified check or money order made payable to the order of "Wage and Hour Division, Labor." The remittance shall be delivered or mailed to the Wage and Hour Division office in the manner directed in the Administrator's notice of determination.   The payment or performance of any other remedy prescribed by the Administrator shall follow procedures established by the Administrator. Distribution of back wages shall be administered in accordance with existing

33

be erroneous.[9] As discussed above, however, 8 U.S.C. § 1182(n)(2)(C)(i) and 20 C.F.R. §§ 655.738 and 655.810 provide sufficient authority for the debarment sanction, notwithstanding this error.

## VII.

Cyberworld also argues that the Secretary should have exercised her discretion not to impose the debarment sanction. The Government, on the other hand, maintains that because § 1182(n)(2)(C)(i) states that "the Secretary shall notify the Attorney General of such finding," and that "the Attorney General shall not approve petitions filed with respect to that employer . . during a period of at least 1 year," the Secretary does not have any such discretion.

Cyberworld relies on *Asika v. Ashcroft*, 362 F.3d 264 (4th Cir. 2004), and *Heckler v. Chaney*, 470 U.S. 821 (1985), for the proposition that the Government can exercise discretion even when a statute uses apparently mandatory language. However, these cases stand, at most, for the proposition that the Government could choose to exercise discretion even where a statute does not specifically refer to its discretionary authority. They do not say that a court can *require* the exercise of discretion when a statute contains a mandatory penalty. The

procedures established by the Administrator.

[9] It appears that the reference in § 655.855(a) and (c) should be to § 655.810(d) instead of § 655.810(f).

34

Government has correctly read § 1182(n)(2)(C)(i) to foreclose its exercise of discretion, and neither *Asika* nor *Heckler* provides authority for a court to compel the Government to exercise discretion when a statute's language indicates that no such discretion exists.

Cyberworld argues, however, that if we find that the Secretary retained jurisdiction after the thirty-day deadline despite the use of the word "shall" in § 1182(n)(2)(B), we must allow the Government to escape the mandatory force of the "shall" in § 1182(n)(2)(C)(i)(I). That is, the two instances of the word "shall" should operate in tandem; if the Government can ignore the binding force of "shall" with respect to the thirty-day deadline, then it should not be bound by the word "shall" in the imposition of sanctions. In the latter context, however, there is no Supreme Court precedent compelling a certain interpretation of the statute, and the Government is not seeking to avoid compliance with its literal terms. Our interpretation of the word "shall" in § 1182(n)(2)(B) thus does not govern our interpretation of the same word as it is used in § 1182(n)(2)(C)(i). *See Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 559 (3d Cir. 2003) (en banc) (noting that the presumption "'that identical words used in different parts of the same act are intended to have the same meaning'" may be overcome when "'there is such variation in the connection in which the words are used as reasonably to warrant the conclusion that they were employed in different parts of the act with different intent'" (quoting *Atl. Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433 (1932))).

35

We agree with Cyberworld that a one-year debarment appears to be a harsh sanction for a company like Cyberworld, which depends on H-1B visa applications for its business, especially when the sanction is being imposed for failing to inquire about possible displacement rather than for actual displacement.  However, this is an issue for Congress to consider, not the courts.

## VIII.

For the reasons stated above, we will affirm the District Court's order granting summary judgment to the Government defendants.